Schenley Land Company, Appellant, *v.* Allegheny County Board of Property Assessment.

Argued April 12, 1965.  Before ERVIN, P. J., WRIGHT, WATKINS, MONTGOMERY, JACOBS, and HOFFMAN, JJ. (FLOOD, J., absent).

*Leonard M. Mendelson,* with him *Edward C. Leckey,* for appellant.

*Francis A. Barry,* First Assistant County Solicitor, with him *James Victor Voss,* Assistant County Solicitor, and *Maurice Louik,* County Solicitor, for appellee.

OPINION BY ERVIN, P. J., June 17, 1965:

Schenley Land Company owned two three-story brick apartment buildings in Pittsburgh, known as 5615 and 5625 Hempstead Road.  The Board assessed this property at $151,450 for the triennial years beginning in 1960, being an assessment of $19,650 for the land and $65,900 each for the buildings.  On appeal by the taxpayer the board sustained the assessment.  Appellant then appealed to the Court of Common Pleas, alleging the assessment exceeded the market value of the property and that lack of uniformity existed.

The board offered in evidence a certified copy of the assessment record and rested, thus establishing a prima facie case for the validity of the assessment: *N. Park Village, Inc. v. Board of Property Assessments,* 408 Pa. 433, 184 A. 2d 253. Through a bookkeeper, appellant offered in evidence the income and expense statements of the apartments for the years 1958 and 1959. The second witness for appellant, Mr. Strauss, a real estate expert, testified the market value of the property was $17,000 for the land and $113,000 for the buildings (total of $130,000) compared to an assessment of $151,450, and that the ratio of assessed to market value was 116%. Mr. Strauss cited five other apartment buildings as alleged comparables and gave his opinion as to the market value compared to the assessed value of each property. On the basis of these figures he found a ratio of assessed to market value of approximately 71%, all ratios being between 70% and 72% as to these comparable apartments.

Appellant also offered in evidence the report of the State Tax Equalization Board to show the ratio between assessed and market value for Allegheny County. The court below excluded such evidence.

The court below rejected in large measure the testimony of Mr. Strauss, on the ground he improperly considered reproduction costs in determining market value of appellant's and the alleged comparable properties. The court also stated that Mr. Strauss relied heavily on the income statements which did not reflect the true economic picture of the property because (1) they did not disclose mortgage payments or depreciation factors and (2) the statements were prepared for income tax purposes.

Admittedly depreciated reproduction cost may not be a major or basic factor in determining market value: *Buhl Foundation v. Bd. of Property Assessment,* 407 Pa. 567, 180 A. 2d 900; *Baldwin-Lima-Hamilton Corp.*

*Appeal,* 412 Pa. 299, 194 A. 2d 434. Here, however, it is clear Strauss did not base his estimate of market value to any material degree on reproduction cost, or to such extent as to invalidate his testimony on market value: Cf. *Crucible Steel Co. v. Allegheny County Board of Property Assessment, Appeals & Review,* 356 Pa. 373, 52 A. 2d 190. For instance, Strauss stated on redirect examination that the reproduction cost would not affect his valuation. Nor were the income statements irrelevant or invalid because they did not contain mortgage or depreciation figures, or because they were prepared for income tax purposes. This evidence of income derived from the property was relevant on the issue before the court and should have been considered by it: *Park Drive Manor, Inc. Tax Assessment Case,* 380 Pa. 134, 110 A. 2d 392; *Flamingo Apartments, Inc. v. Board of Revision of Taxes,* 383 Pa. 223, 118 A. 2d 197; *Buchman Tax Assessment Case,* 164 Pa. Superior Ct. 137, 63 A. 2d 136.

Strauss' testimony as to comparables was admissible both to show market value of the contested property, and also to show lack of uniformity: *Deitch Co. v. Board of Property Assessment,* 417 Pa. 213, 209 A. 2d 397; *McKnight Shopping Center, Inc. v. Board of Property Assessment,* 417 Pa. 234, 209 A. 2d 389.

In this case no countervailing evidence was offered by the board. Where no countervailing proof is offered by the board and the taxpayer's evidence is relevant and credible, it must be given due weight and cannot be ignored by the court: *Deitch Co. v. Board of Property Assessment,* supra; *McKnight Shopping Center, Inc. v. Board of Property Assessment,* supra. As indicated in *McKnight Shopping Center, Inc. v. Board of Property Assessment,* supra, while the testimony of appellant's witnesses may not have been completely satisfactory, it "cannot be disregarded unless the lower court in the exercise of its discretion

finds it incredible." The statement of the court below that there is no competent evidence to show the assessment is unfair, or lacking in uniformity, is not supported by the record.

This appeal also raises the question whether the State Tax Equalization Board figures were admissible to show the ratio of assessed to market value in the district. This evidence is not, under the implications of *Pittsburgh Miracle Mile Town & Country Shopping Center, Inc. v. Board of Property Assessment*, 417 Pa. 243, 209 A. 2d 394, presently admissible, and the ruling of the court below on this point was correct.

Section 17 of the Act of June 27, 1947, P. L. 1046, 72 PS §4656.17, which created the State Tax Equalization Board, provides as follows: "Nothing contained in this act shall be construed to change or affect the validity of the assessed valuation of any real property for the purpose of levying taxes by any political subdivision."

The very purpose of the offer of the report was "to change or affect the validity of the assessed valuation of" the real estate involved in this appeal. The offer, therefore, flies in the teeth of §17 and could not be admitted.[1]

---

[1] Our research reveals that no county in the Commonwealth assesses real estate at full market value for purposes of taxation. According to the most recent certification of the Pa. State Tax Equalization Board (June 30, 1964), the lowest ratio of assessed valuation to market value occurs in the County of Mifflin at 21.8% and the highest ratio occurs in the County of Philadelphia at a ratio of 69.6%

Art. IX, §1 of the Constitution of 1874, provided: "All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax. . . ." All amendments of this article and section of the Constitution have retained the above provision as to uniformity without any change of language.

Where it is impossible to secure both the standard of the true value and the uniformity and equality required by the Constitu-

tion, the latter requirement is to be preferred as the just and ultimate purpose of the law: *Brooks Building Tax Assessment Case*, 391 Pa. 94, 101, 137 A. 2d 273.

This cardinal principle of equality of taxation is largely defeated so far as most taxpayers are concerned because of the procedures dictated by court decisions for the conduct of tax assessment appeals. By a great number of decisions the appellate courts of this State have held that the board of revision makes out a prima facie case for the validity of the assessment by merely offering that assessment in evidence. By an equally great number of cases, our appellate courts have also placed the burden upon the taxpayer to go forward with the presentation of evidence to show that the assessment exceeds market value or that it is not uniform in comparison with the assessments used generally throughout the tax district. For many years the taxpayer has been confronted with this terrific burden.

In the recent case of *Pittsburgh Miracle Mile Town & Country Shopping Center, Inc. v. Board of Property Assessment*, 417 Pa. 243, 247, 209 A. 2d 394 our Supreme Court has stated: "All evidence which seeks to establish a ratio should be directed to the whole of the taxing district involved." In the present case that would mean the whole of Allegheny County. Just how many valuations the property owner should present in order to establish a common ratio of assessed valuation to market value for the entire county is questionable. There has been considerable variation in the treatment of this question by our appellate courts and some confusion exists at the present time in the minds of most persons who have given study to this subject as to just what should be done by a taxpayer to meet this burden.

As was so well stated by Judge WOODSIDE in the case of *Buerger v. Allegheny County Board of Assessment*, 188 Pa. Superior Ct. 561, 565, 149 A. 2d 466, "Unless the taxpayer's constitutional right to uniformity is to be completely denied him, the courts must leave open to him some practical way to establish lack of uniformity in assessments." By way of further dictum in that case, Judge WOODSIDE said, at page 567: "The legislature has established a board whose duty it is to determine the ratio of assessed value to actual value. It approaches the problem scientifically, and with far more complete and accurate information than would be practical, if indeed possible, to produce in a court trial. Any student of government—any scientist—any businessman with knowledge of the procedures would accept the State Tax Equalization Board's determination of the ratio of actual value to assessed value in a district, as more nearly accurate than the opinion of the local as-

sessor or any real estate appraiser. Must those of us whose business is the determination of facts continue to follow the cow paths toward the goal of truth when there is available a modern turnpike leading to that goal?"

For a further study of the methods employed by the State Tax Equalization Board an excellent pamphlet has been prepared by that board under the title of "The Equalization Board Story," which may be obtained upon application to the State Tax Equalization Board, Harrisburg, Pa. For 16 years that board has had furnished to it by the local county boards of revision monthly reports to show the state and federal stamps upon each transfer of property, together with the assessed valuation for tax purposes of that property. The revenue stamps on these deeds reveal the actual consideration for the transfers of all real estate in the State of Pennsylvania for a 16-year period. Where could anyone find a greater or more accurate body of evidence to show the ratio of assessed valuation to market value? There is not and cannot be any other evidence in existence to compare with this excellent source of information. Had the report been received in evidence in the present case it would have shown a ratio of assessed value to market value of 50.6% as compared to the testimony in this case of a ratio of 116% of assessed value to market value.

A study of the ratios for the various counties, as computed by the Pa. State Tax Equalization Board, will show very little variation over the years. The ratio for Allegheny County for the years 1960 through 1963 is as follows: 1960, 50.6; 1961, 51.1; 1962, 50.9, 1963, 51. This presents some proof as to the accuracy of the ratios. If the ratio as computed by the State Tax Equalization Board could be admitted into evidence, most of the problems which arise out of these numerous tax assessment appeals would vanish. The burden of proof would then be passed back to the board of revision, where it should be, and it would then be permitted, if it could do so, to offer evidence to show that the ratio is in error or that the market value of the property in question is different from that shown by the evidence of the property owner. We. therefore, join with the suggestion contained in the footnote of *Pittsburgh Miracle Mile Town & Country Shopping Center, Inc. v. Board of Property Assessment*, supra, and would strongly urge the legislature to repeal §17 of the Act of June 27, 1947, P. L. 1046.

Chief Justice BELL, in his dissent in the case of *Deitch Co. v. Board of Property Assessment*, 417 Pa. 213, 232, 209 A. 2d 397, 407, evidently feels that the report should not be admissible even though §17 of the act be repealed because "The figures represent only 'sales', and no one knows whether the sales represent a sher-

iff's or other forced sale, or a sale between a willing buyer and a willing seller, and no party is given an opportunity to challenge the figures or cross-examine any witness, nor is it an admission against interest." This objection is pretty largely answered by a statement in the pamphlet entitled "The Equalization Board Story" at pages 13 and 14 thereof, as follows: "Having ascertained property inventories in terms of aggregate assessments; the next step is to determine the market value conversion indexes. As explained previously, the key to conversion is the *average* 'assessment-sales ratio.' That is, the *average* percentage relationship of assessments to bona fide selling prices. The basic data used are real property transfers reported by counties. (See County Officials Duties and Responsibilities, page 20.)

"A basic problem in using real property sales is the elimination of transfers wherein selling prices are not bona fide. STEB, along with professional appraisers, recognize that selling prices are the best evidence of market value. Circumstances, however, may nullify such evidence. STEB rejects: sales between relatives; between corporations and affiliates; sales involving special reservations or agreements; transfers motivated by special need or speculation; transfers with personal property involved in the consideration; sales involving charitable, religious, or governmental organizations; forced sales; or any other transfers with circumstances that knowingly would distort selling prices.

"In other transfers, selling prices may be bona fide; but reported assessments may not be comparable for 'assessment-sales ratio' purposes. For example, the property sold may be a portion of a larger tract; but the reported assessment includes the entire tract. Or the sale may include a newly-constructed building not assessed as yet when reported. Such transfers are rejected or the comparable assessments ascertained.

"Besides facts reported by counties and staff investigators, other precautions are taken by STEB to eliminate questionable transfers. Non-bona fide selling prices and non-comparable assessments tend to result in *extreme* 'assessment-sales ratios.' Consequently, transfers with extremely low or high ratios of assessments to selling prices are rejected. This policy is based on periodic studies and operates on the premise that extreme ratio transfers would have been rejected anyway had the facts been reported or ascertainable.

"Another policy relative to using selling prices, tends to promote conservatism and realism in STEB market values. Periodically, selling prices are compared with market values on the same properties, as appraised by independent appraisers. Based on these

comparisons, STEB uniformly discounts its market values before certifying for subsidy purposes.

"This discount policy operates on the conclusion that selling price tends to express a short-term concept of worth. It is what a buyer will pay today, right now, because of a desire, a want or a necessity. Value, on the other hand, is a long-range concept of worth; concept of accrued benefits over future periods. Many authorities feel selling prices with nothing or little down and balance spread over twenty to thirty years, do not indicate long-range value. Buyers in such cases are more concerned with immediate and monthly cash outlays rather than selling prices. Appraised market values of such properties in recent years tend to be more conservative than selling prices. Thus the uniform STEB discount policy.

"A study by the International Association of Assessing Officers also supports STEB's discount policy. This study concludes that: '. . . present sales prices are far better evidence of value . . . provided the evidence based on sales is properly discounted to rule out any premiums for immediate occupancy, bonus for shelter, or any other similar charges.' [Revaluation Projects, International Association of Assessing Officers. (Ill. 1960)]

"Another study reported in the official appraisal publication of the National Association of Real Estate Boards concurs in this policy. This study concludes that: 'assessment-sales ratios' should be converted to 'assessment-market value ratios' by measuring the average difference between large numbers of sales and appraisals on the same properties. [The Appraisal Journal, Illinois, page 214, April 1956.]

"Another basic problem in 'assessment-sales ratio' studies is the tabulating, recording and sorting of hundreds of thousands of real estate transfers. To date, STEB has processed approximately three and one-half million real estate transfers with selling prices of over $17 billion dollars. To facilitate processing, STEB puts sales data on IBM punched cards. Thus, a variety of tabulations are possible for determining assessment-ratios by property types, by school districts and by municipalities. These tabulations, also, provide a basis for considering different statistical averages; such as the mean, median and mode."

The Chief Justice also points out that an opportunity to challenge the figures or cross-examine any witness should be allowed. Ordinarily this is a correct statement of the law but it should be remembered that we are here dealing with an appeal from a tax assessment. The board of revision is the opposite party to the appellant property owner. Most of the information which the State Tax Equalization Board uses it obtains from reports submitted by

the local board of revision. It certainly must have in its possession copies of the reports of all sales which it monthly submits to the state board. This means that it already knows the amount of State and federal stamps on each transfer of property as well as the assessment which it has placed on that property. In other words, the local board already has in its possession the basic information upon which the ratio is computed by the state board. The local board can very easily determine whether the state board's computation is in error. Our research reveals that most local boards actually know that the ratio as computed by the state board is substantially correct. If the local board does not want to have admitted into evidence the ratio as computed by the state board, then at least it should be compelled to state honestly in open court the ratio which it uses and instructs its assessors to use. It should not be permitted to say that it uses 100% market value when it is well known that there is no county in the state which actually does this.

Our research has revealed another solution for this perplexing problem. The Act of May 22, 1933, P. L. 853, known as The General County Assessment Law, provided for the preparation of the assessments for taxation purposes of all property in all eight classes of counties in the State of Pennsylvania. In 1943 that act was repealed by the Act of May 21, 1943, P. L. 571, as to counties of the 4th, 5th, 6th, 7th and 8th classes, and in 1951 the latter act was amended by the Act of January 18, 1952, P. L. 2138, 72 PS §5453.602. By §602 of the 1951 act it was provided that "Real property shall be assessed at a value based upon an established predetermined ratio, of which proper notice shall be given, not exceeding seventy-five per centum (75%) of its actual value or the price for which the same would separately bona fide sell."

A method has been provided by the legislature for counties of the 4th to 8th class inclusive to enable the property owner appellant in a tax assessment case to obtain from the board the predetermined ratio which the board uses in his county. This greatly eases the burden of the property owner because all that he has to do after obtaining the ratio is to present evidence to show that his property as assessed is not in accordance with the ratio. We believe that such a provision is called for as to the first three classes of counties for the purpose of providing constitutional uniformity in the assessment of all properties in the Commonwealth. Certainly the legislature should not be heard to say that such a provision is good for the 4th, 5th, 6th, 7th and 8th classes of counties but is not good for the 1st, 2nd and 3rd classes of counties. We do not believe, however, that the legislature should place a 75% ceiling

The court below was in error in its view that much of appellant's evidence on market value and uniformity was invalid. The case should be reviewed and consideration given to the recent Supreme Court cases of *Deitch Co. v. Board of Property Assessment,* supra, and *McKnight Shopping Center, Inc. v. Board of Property Assessment,* supra.

The order of the court below is vacated and the case is remanded for further proceedings consistent with this opinion.

WRIGHT, J., concurs in the result.

---

on the ratio. In our judgment the ceiling should be raised to 100%.

Both of the legislative enactments recommended in this footnote would materially help to give to all the property owners in the Commonwealth the equality in assessments which our Constitution demands.