**AETNA LIFE INSURANCE CO., Appellant**

v.

**MONTGOMERY COUNTY BOARD OF ASSESSMENT APPEALS, Whitpain Township, Wissahickon School District and Montgomery County.**

Commonwealth Court of Pennsylvania.

Argued Feb. 9, 2015.

Decided March 12, 2015.

---

Joseph J. McAlee, Southeastern, for appellant.

Joan R. Price, Norristown, for appellee Montgomery County Board of Assessment Appeals.

Margaret P. Choksi, Blue Bell, for appellee Whitpain Township.

Scott H. Wolpert, Ft. Washington, for appellee Wissahickon School District.

Nicole R. Forzato, Norristown, for appellee Montgomery County.

BEFORE: DAN PELLEGRINI, President Judge, and P. KEVIN BROBSON, Judge, and PATRICIA A. McCULLOUGH, Judge.

OPINION BY Judge McCULLOUGH.

Aetna Life Insurance Co. (Aetna) appeals from the June 25, 2014 order of the Court of Common Pleas of Montgomery County (trial court) denying its tax assessment appeal. We affirm.

## Background

For tax year 2009, Aetna filed a real estate tax assessment appeal with the Montgomery County Board of Assessment Appeals (Board) with respect to a parcel of real property located at 980 Jolly Road, Whitpain Township, Montgomery County (the Property). On October 27, 2008, the Board issued a notice denying the appeal, and Aetna appealed to the trial court, challenging the assessments to the Property for tax years 2009 through 2014. Thereafter, Montgomery County, Wissahickon School District (School District), and Whitpain Township praeciped for intervention. (Trial court op. at 1–2.) The trial court convened a non-jury trial.

At trial, the parties introduced into evidence a joint stipulation of facts and the appraisal reports of their experts, Leonard J. Patcella (Patcella) for Aetna and Mark Abissi (Abissi) for the School District. (Finding of Fact (F.F.) at 1.) The Property is approximately 10 acres and is currently located in a Research and Engineering (R–E) District. The Property has situated on it one office building that is 155,614 gross square feet; the office building is multi-story and configured for single-tenant occupancy; and the office building has a parking lot with 725 parking spaces. The Property is located in a developed commercial area that includes office uses by various large corporations. (F.F. at 4, 6, 10–13.)

The office building on the Property is fully air-conditioned, has adequate electrical and heating service, and each floor has private offices, cubicle partitions, men's and ladies' lavatories, and elevators. Additionally, the office building has an employee cafeteria with a full service kitchen; a fitness area; training areas; a mail room; conference rooms; and a loading dock area. Aetna is the only owner and occupier of the Property, no other tenants are present, and Aetna uses the office space for its corporate business. In their appraisal reports, Patcella and Abissi agreed that the Property is best suited for single-tenant occupancy, and they both used the sales and income approaches to determine the Property's fair market value. (F.F. at 16–23; Reproduced Record (R.R.) at 221a, 381a.)

The parties also presented the expert testimony of Patcella and Abissi. The parties stipulated to their qualifications and they were accepted by the trial court as experts. (R.R. at 16a–17a, 222a.)

Patcella and Abissi both testified and agreed that out of all the approaches to property valuation, the sales comparison approach was the most reliable and valid indicator of the Property's market value. They also agreed that the highest and best use of the property was single-tenant occupancy. (F.F. at 23, 25, 27, 40, 43.)

Abissi testified that in employing his methodology for the sales comparison approach, he first identified those sales that he felt were most comparable and then confirmed that the sales were arm's length transactions by calling either the buyer, seller, or broker. Abissi stated that the most important factors in determining comparable sales for the Property were: (1) the size and square footage of the building; (2) location; (3) age; (4) owner-occupied or tenant occupied use; (5) sale

date; (6) condition and quality of construction; (7) functional utility; (8) land-to-building ratio; (9) parking ratio; and (10) overall utility of the property. Abissi testified that he also performed an income analysis for purposes of serving as a check against the sales comparison approach. Abissi stated that his use of the income approach resulted in lowering the Property's fair market value in some years, but, in any event, he did not place significant weight on the income approach in determining fair market value. (F.F. at 35, 43, 49–50.)

Abissi further testified that the owner-occupied nature of the building was a factor for valuation under the comparable sales approach because there are two different markets, one for owner-occupiers and one for multi-tenant buildings. (F.F. at 36–37.)

According to Abissi, single-tenant or occupied-owner sales are more reliable in valuing the Property because the Property is owner-occupied or has a single-tenant use. However, Abissi testified that there were not many sales of owner-occupied facilities within the past few years, and, as a result, he had to also include sales involving tenant-occupied buildings in his analysis. Abissi stated that in using tenant-occupied sales as comparables, he considered making adjustments to account for the fact that the Property was owner-occupied. (F.F. at 39, 41, 46; R.R. at 225a–26a.)

Ultimately, Patcella and Abissi rendered opinions as to the fair market value of the Property for tax years 2009 through 2014, based primarily upon the sales comparison approach. (See F.F. at 51–122.) Pertinent to this appeal, Abissi utilized a total of twelve comparables, five of which were not owner-occupied and had either a single tenant or multiple tenants in place at the time of sale. The five properties that were

sold subject to a tenancy are located at: (1) 2750 Monroe Boulevard, Lower Providence Township; (2) 2800 Kelly Road, Warrington Township; (3) 1150 Northbrook Drive, Bensalem Township; (4) 455 South Gulph Road, Upper Merion Township; and (5) 200–400 Campus Drive, Upper Providence Township (collectively, "the Tenant Comparables"). (See R.R. at 586a–87a; 656a–57a; 735a–36a; 739a–40a; 819a–21a; Aetna's brief at 10–11).

Abissi also employed three properties as comparables that were purchased through transactions that were not advertised to the public. The first property (455 South Gulph Road, Upper Merion Township) was sold through what is commonly known as a 1031 exchange, where the individual deferred capital gains under 26 U.S.C. § 1031 by exchanging property for another "like-kind" property. The second property (250 Gibraltar Road, Horsham Township) was sold as part of a sale-leaseback agreement, where the buyer entered into a lease agreement with the seller for the sale price. The third property (200 Tournament Drive, Horsham Township) was sold pursuant to an option-to-purchase agreement, where a tenant exercised its contractual rights to purchase the property (collectively, "the Transactional Comparables"). (See R.R. at 187a–91a; 299a.)

On the other hand, Patcella testified that, in general, he relied on comparable sales that were different from those utilized by Abissi. (See F.F. at 52, 57–58, 66–73, 104–07, 109.) However, Patcella stated that, like Abissi, he employed sales of multi-tenant and single-tenant office buildings in arriving at the Property's fair market value. Of the numerous comparable sales used by both Patcella and Abissi, only four were the same and only two were owner-occupied office buildings. (R.R. at 507a–39a; 585a–91a; 655a–59a; 737a–44a; 811a–20a.)

Patcella and Abissi also testified with respect to market stabilization. In short, Abissi opined that the relevant market was stabilizing between 2012 and 2013, while Patcella opined that the relevant market was in a state of significant decline and showed no signs of improving. (*See* F.F. at 123–42.)

By order dated June 25, 2014, the trial court accepted the opinions and testimony of Abissi as reliable and credible and found that they were more persuasive than those proffered by Patcella. (F.F. at 143–44.) In pertinent part, the trial court made the following findings of fact:

**A. Details of Subject Property**

11. The subject property contains one office building that is approximately 155,614 gross square feet.

\* \* \*

20. For each year at issue, the subject property was owner occupied as office space for its corporate business.

21. Aetna is the single occupier of the subject property and is the only entity currently occupying the subject property, as no tenants are present.

\* \* \*

**D. Valuation Approach**

\* \* \*

36. Both Mr. Abissi and Mr. Patcella testified that the owner occupied nature of the building was important for a valuation under the comparable sales approach and that there are two different markets, one for owner-occupiers and one for multi-tenant buildings; with the former looking more at a property's location, address, building amenities and the latter looking more at the property's income stream.

37. Mr. Abissi testified that the market for owner-occupied office buildings is smaller than the market for multi-tenant office buildings. An owner-occupier is looking at the amenities that a building can offer such as a large atrium, cafeteria, training centers; whereas investors looking at multi-tenant buildings are looking to maximize interior space for leasing.

\* \* \*

·39. Mr. Abissi testified that in valuing the subject property based on comparable sales, single owner/occupied sales were more reliable since the subject property was owner occupied or single tenant use.

40. Both Mr. Abissi and Mr. Patcella testified that the sales comparison approach was the more reliable and a more valid indicator of value for the subject property because of the subject property's owner-occupied or single tenant use.

41. Mr. Abissi stated that there were not many sales of owner-user facilities within the past few years.

42. Mr. Abissi stated that he did not believe that the property would sell as an investor type property.

\* \* \*

47. Based on the type of property at issue and the credible testimony from School District's expert, Mr. Abissi, the sales approach to valuation provides the most persuasive and appropriate method to determine market value.

48. Mr. Abissi testified that the appropriate size range for determining comparable sales under the sales approach for the subject property is between 50,000 square feet and 250,000 square feet given the subject's gross square footage and because of the lack of sales in the 100,000 to 200,000 square footage range.

49. Mr. Abissi testified that his methodology was to first to identify those sales that he felt were most comparable, then gather the sale information to con-

firm that the sales were arm's length transactions and verify the sales information by calling either the buyer, seller or broker.

50. With regard to verifying sales, Mr. Abissi stated[:] "If you can't verify the sale, it's very difficult to use that sale in an analysis for an appraisal because there could be factors that you're not aware of. There could be special financing involved. There could have been some givebacks at settlement that aren't showing on the deed or anywhere in terms of public records ... [I]ts very important to verify the sales."

\* \* \*

E. Valuation for Tax Year 2009

51. In determining value for tax year 2009 under the sales comparison approach, Mr. Abissi reviewed four properties, ranging in size from 62,739 to 200,976 square feet and that were transacted between February 2007 and June 2008.

52. Mr. Patcella acknowledged that the various properties identified in the Abissi report evaluation as of January 1, 2009 used comparable sales that were much closer to or even exceeded the gross square footage of the subject Aetna property, as compared to those comparable sales utilized by Mr. Patcella, specifically: 220 Tournament Drive, Horsham Township [Transactional Comparable]; 2750 Monroe Boulevard, Lower Providence Township [Tenant Comparable]; and 250 Gibraltar Road, Horsham Township [Transactional Comparable].

53. The adjusted price per square foot for the four sales used by Mr. Abissi for 2009 ranged from $141.52 to $195.58 per square foot.

54. Of the four reviewed, two were most significant in determining value as they were most like the subject property.

55. The first sale that was most significant was a September 2007 sale of a 109,281 square foot, single-tenant office building built in 1982 located at 2750 Monroe Boulevard, Lower Providence Township for $26,700,000 or $244.32 per square foot. [Tenant Comparable]

56. The second sale that was most significant was a March 2007 sale of a much smaller (62,739 square foot) multi-tenant building constructed in 1973 located at 901 East Eighth Avenue, Upper Merion for $9,450,000.

\* \* \*

59. Mr. Abissi's opinion of value based on the sales comparison approach for 2009 was $26,500,000 or $170 per gross square foot.

60. Mr. Abissi developed a valuation based on the sales comparison approach and the income approach and reconciled these two valuations to arrive at an opinion of value for January 2009 as $25,500,000.

\* \* \*

F. Valuation for Tax Years 2010 and 2011

61. In determining value for years 2010 and 2011 under the sales comparison approach, Mr. Abissi reviewed four properties, ranging in size from 63,612 to 142,124 square feet and that were transacted between June 2008 and December 2010.

62. The adjusted price per square foot for the four sales used by Mr. Abissi for 2010 and 2011 ranged from $115.74 to $167.88 per square foot.

63. Of the four properties reviewed, two properties were most significant in determining value.

64. The first property that was most significant was the sale of a 142,000

square foot, multi-tenant office building built in 1983 located in Upper Merion for $26,510,000 or $186.53 per square foot. [*Tenant and Transactional Comparable*]

65. The second property that was most significant was the sale of a 94,661 square foot, owner-occupied (corporate headquarters) building built in 1993 located in Uwchlan Township, Chester County containing a large lobby similar to the subject property for $13,000,000 or $137.33 per square foot.

\* \* \*

67. Of the properties identified as comparables by Mr. Patcella, three had a gross square footage of 48,300 or below, which was about only one-third of the total gross square footage of the subject property and was about 100,000 square feet less than the subject property.

68. Additionally, in his adjustment grid, Mr. Patcella applied only a minus 15% adjustment for these properties under the category of Relative Building Size, despite the dramatic difference in gross square footage between the properties that Mr. Patcella claims are comparable to the subject property. He acknowledged that there was no industry criteria that would lead him, as an appraiser, to apply a specific adjustment of 15% related to relative building size. Instead, he described his actions as a "subjective adjustment."

\* \* \*

74. Mr. Abissi's opinion of value based on the sales comparison approach for 2010 was $22,000,000 or $142 per square foot.

75. Mr. Abissi's opinion of value based on the sales comparison approach for 2011 was $21,450,000 or $138 per square foot.

76. Mr. Abissi developed a valuation based on the sales comparison approach and the income approach and reconciled these two valuations to arrive at an opinion of value for January 1, 2010 as $22,000,000.

77. Mr. Abissi developed a valuation based on the sales comparison approach and the income approach and reconciled these two valuations to arrive at an opinion of value for January 1, 2011 as $21,450,000.

### G. Valuation for Tax Year 2012

78. In determining value for tax year 2012 under the sales comparison approach, Mr. Abissi reviewed five properties ranging in size from 63,612 to 142,124 square feet and that were sold between April 2010 and March 2012.

79. The adjusted price per square foot for the five sales used by Mr. Abissi for 2012 ranged from $110.19 to $167.88 per square foot.

80. Of the five properties reviewed, three were most significant in determining value.

81. The first property that was most significant was the sale of a 70,970 square foot, single tenant building built in 2006 with a lot of open space, a full service cafeteria, training centers and conference facilities, in New Britain Township for $8,500,000 or $119.77 per square foot.

82. The second property that was most significant was the same sale that was most important to the 2010 and 2011 valuations, namely the sale of a 142,000 square foot, multi-tenant office building built in 1983 located in Upper Merion for $26,510,000 or $186.53 per square foot. [*Tenant and Transactional Comparable*]

83. The third property that was most significant was the same sale that was most important to the 2010 and 2011

valuations, namely the sale of a 94,661 square foot, owner-occupied (corporate headquarters) building built in 1993 located in Uwchlan Township, Chester County for $13,000,000 or $137.33 per square foot.

84. Mr. Patcella's summary of sales comparison approach contained in his valuation as of September 1, 2011 (which was for tax year 2012) referenced comparable sales # 6, 7, 8, 9 and 10. He acknowledged that his comparables # 6, 8, 9 and 10 contained gross square footage that were over 100,000 square feet less than the subject property.

\* \* \*

94. Mr. Abissi's opinion of value based on the sales comparison approach for 2012 was $19,600,000 or $126 per square foot.

95. Mr. Abissi developed a valuation based on the sales comparison approach and the income approach and reconciled these two valuations to arrive at an opinion of value for January 1, 2012 as $20,100,000.

**H. Valuation for Tax Years 2013 and 2014**

96. In determining value for tax years 2013 and 2014 under the sales comparison approach, Mr. Abissi reviewed six properties; ranging in size from 63,612 to 183,360 square feet and that were transacted between April 2010 and March 2013.

97. The adjusted price per square foot for the six sales used by Mr. Abissi for 2013 and 2014 ranged from $110.19 to $167.88 per square foot.

98. Of the six properties reviewed, four were most significant in determining value.

99. The first property that was most significant was the same sale that was most important to the 2012 valuation, namely the sale of a 70,970 square foot, single tenant building built in 2006 with a lot of open space, a full service cafeteria, training centers and conference facilities located in New Britain Township for $8,500,000 or $119.77 per square foot.

100. The second property that was most significant was the same sale that was most important to the 2010, 2011 and 2012 valuations, namely the sale of a 142,000 square-foot, multi-tenant office building built in 1983 located in Upper Merion for $26,510,000 or $186.53 per square foot. [*Tenant and Transactional Comparable*]

101. The third property that was most significant was the same sale that was most important to the 2010, 2011 and 2012 valuations, namely the sale of a 94,661 square foot, owner-occupied (corporate headquarters) building built in 1993 located in Uwchlan Township, Chester County for $13,000,000 or $137.33 per square foot.

102. The fourth property that was most significant was the sale of a 183,-360 square foot, single tenant building with a lobby area and cafeteria built in 2003 located in Upper Providence for $33,000,000 or $179.97 per square foot. [*Tenant Comparable*]

103. In determining a valuation under the sales comparison approach as of August 1, 2013, Mr. Patcella relied on his comparables # 9 through 18. He admitted that comparables # 9–15 were previously considered by him for the prior year, which he valued at over $6,100,000 higher than his valuation as of August 1, 2012. As such, he admitted that his suggested dramatic decrease in valuation of $6,163,000 was based only on his comparable sales # 16, 17 and 18.

\* \* \*

109. Mr. Abissi testified that these sales (Aetna Sales # 16, 17 and 18) were not reliable comparisons and should not be used to value the subject property.

\* \* \*

114. Based on the testimony and reports containing numerous sale transactions over the relevant periods from both experts, there was not a glut of distressed sales for comparison purposes to the subject property for the time period in question.

115. The opinions and findings of Aetna's expert, Mr. Patcella, were not credible and are rejected.

\* \* \*

119. Mr. Abissi's opinion of value based on the sales comparison approach for 2013 was $19,600,000 or $126 per square foot.

120. Mr. Abissi's opinion of value based on the sales comparison approach for 2014 was $19,600,000 or $126 per square foot.

121. Mr. Abissi developed a valuation based on the sales comparison approach and the income approach and reconciled these two valuations to arrive at an opinion of value for January 1, 2013 as $19,200,000.

122. Mr. Abissi developed a valuation based on the sales comparison approach and the income approach and reconciled these two valuations to arrive at an opinion of value for January 1, 2014 as $19,200,000.

I. **Testimony on Market Conditions**

123. With respect to market stabilization, Mr. Abissi opined that the market appeared to be stabilizing between 2012 and 2013, and that the data indicates that the office market dipped, during 2009 and 2010 with subsequent improvement and stabilization; and that, contrary to Mr. Patcella's opinion, the office market for the Montgomery County area is not in the tank or not coming back.

124. In determining whether the office market is stabilizing, the factors considered by Mr. Abissi are: whether vacancy rates are increasing, decreasing or staying the same; whether there is absorption of existing space; whether there is new construction; and whether rental rates are decreasing or increasing.

125. Mr. Abissi further testified that the vacancy rates stayed relatively stable between 2013 and 2014 and the rental rates only slightly decreased but not enough to warrant any kind of change in value between 2013 and 2014.

126. On re-cross, Mr. Patcella testified that the Blue Bell market was still in the "mid–20s" in regard to a vacancy rate. He also testified that the Blue Bell market had a mid–20s vacancy rate in late 2012. He acknowledged that from 2009 through the time of trial, the vacancy rate in the Blue Bell market had been between approximately 27% and 29%, which was consistent range. He acknowledged that despite this consistent vacancy rate, he identified a value reduction between September 1, 2012 and September 1, 2013 as $6,100,000 for the subject property.

\* \* \*

128. The decrease suggested by Mr. Patcella for the period between August 1, 2012 and August 2013 in the sum of $6,163,000 was by far the largest decrease in his estimated valuation for the subject property for any of the years at issue and was first identified by Mr. Patcella in a report which was issued just a few weeks before the commencement of trial in this matter.

(F.F. at 11, 20–21, 36–37, 39–42, 47–56, 59–65, 67–68, 74–84, 94–103, 109, 114–15, 119–26, 128; citations to record and notes of testimony omitted, added information in brackets and italicized.)

In addition to the flaws that the trial court observed in Patcella's testimony noted in the above findings of fact, the trial court noted other deficiencies in his testimony, as follows:

134. Mr. Patcella testified that some of the properties he selected as comparable sales have substantially less gross square footage than the subject Aetna property. For example, the property located at 901 East 8th Avenue was identified as having 58,972 gross square feet in Mr. Patcella's 2008 report and as having 62,739 gross square feet in his 2013 report.

\* \* \*

136. Mr. Patcella identified a property located at 410 Horsham Road as a comparable sale with a sale date of April 27, 2007. Mr. Patcella's 2008 report identified a sale price of $8,895,000. Mr. Patcella's 2013 report identified a sale price for the same property on the same date as $9,895,000. He stated that this $1,000,000 difference was a "typo"

137. Mr. Patcella also changed the gross square footage between his 2008 and his November 2013 report related to the 410 Horsham Road property, listing a total square footage of 88,433 square feet in 2008 and a gross square footage of 90,271 square feet in his November 2013 report.

138. Despite the fact that Mr. Patcella's 2008 report contained the same language regarding his opinion being rendered as a result of the careful inspection and careful analysis during the process of preparing the report, a comparison of Mr. Patcella's 2008 report and his November 2013 report identifies many material differences which affect the price per square foot on the sales that he claims are comparable sales. As such, Mr. Patcella's opinions are not credible and his testimony is not reliable.

(F.F. at 134, 136–38, citations to the record and notes of testimony omitted.)

From these findings and the reasoning contained therein, the trial court found that: "Based on the testimony presented and the reports submitted into evidence, as recited above, the comparable sales and valuation methodology used by Mr. Abissi are credible and more persuasive as to the determination of market valuation for the [Property] than Mr. Patcella." (F.F. at 143.) The trial court further found that "[t]he opinions and testimony of Mark Abissi, MAI, are credible and reliable and are accepted by the [c]ourt." (F.F. at 144.)

Based upon Abissi's credible testimony, the trial court determined the market value of the Property as follows: $25,500,000 as of January 1, 2009; $22,000,000 as of January 1, 2010; $21,450,000 as of January 1, 2011; $20,100,000 as of January 1, 2012; $19,200,000 as of January 1, 2013; and $19,200,000 as of January 1, 2014. After applying the common level ratios for the Property,[1] the trial court determined the

---

1. "Common level ratio is the ratio of assessed value to current market value. The ratio is calculated annually for the County by the State Tax Equalization Board (STEB) from information provided to STEB by the County of the preceding year's arms-length transactions, pursuant to the Tax Equalization Act of June 27, 1947, P.L. 1046, *as amended*, 72 P.S. §§ 4656.1–4656.17." *City of Lancaster v. County of Lancaster*, 143 Pa.Cmwlth. 476, 599 A.2d 289, 292 n. 6 (1991).

Here, the parties stipulated to the applicable common level ratios for each tax year. (R.R. at 850a.)

assessments for the Property as follows: $12,954,000 for 2009; $11,880,000 for 2010; $12,033,450 for 2011; $11,658,000 for 2012; $11,904,000 for 2013; and $12,172,800 for 2014. (Order, 6/25/2014).

Aetna filed a notice of appeal, and the trial court directed Aetna to file a Pa. R.A.P. 1925(b) statement, which it did, asserting for a variety of reasons that the trial court erred in accepting the testimony of Abissi and rejecting the testimony of Patcella. (Aetna's 1925(b) statement at 2–4.)

In its Pa.R.A.P. 1925(a) opinion, the trial court found that the thrust of Aetna's assignments of error in its Pa.R.A.P. 1925(b) statement concerned the trial court's credibility and weight determinations. Relying on the factual findings and determinations in its June 25, 2014 order, the trial court summarily found that Aetna's arguments did not merit relief. The trial court reiterated that, in its role as fact-finder, it accepted the expert testimony of Abissi as credible and more persuasive than the expert testimony of Patcella. (Trial court op. at 4.)

### Discussion

Initially, we note that section 402(a) of The General County Assessment Law (Assessment Law), Act of May 22, 1933, P.L. 853, *as amended*, 72 P.S. § 5020–402(a), identifies three methods of property valuation that must be considered in conjunction with one another when arriving at fair market value for assessment purposes: cost approach, income approach, and comparable sales approach. *Id.*

■ The cost approach considers reproduction or replacement costs of the property, less depreciation and obsolescence.

*Jackson v. Board of Assessment Appeals of Cumberland County*, 950 A.2d 1081, 1084 n. 1 (Pa.Cmwlth.2008). The income approach determines fair market value by dividing the subject property's annual net rental income by an investment rate of return. *Id.* The comparable sales approach compares the subject property to similar properties with consideration given to size, age, physical condition, location, and other factors. *Id.* Significantly, "[t]he trial court has the discretion to decide which of the methods of valuation is the most appropriate and applicable to the given property." *In re PP & L, Inc.*, 838 A.2d 1, 10 (Pa.Cmwlth.2003).

Here, the parties do not dispute the trial court's finding that the comparable sales approach to valuation "provides the most persuasive and appropriate method to determine [the Property's] market value." (F.F. at 47.)

■ We now address Aetna's arguments.[2]

### The Tenant Comparables

Aetna contends that the trial court erred in accepting Abissi's testimony as competent because Abissi relied on the Tenant Comparables. Aetna argues that the Tenant Comparables are significantly dissimilar to the Property because they involve tenant(s) in residence at the time of sale, whereas the Property is only owner-occupied and would be vacant or tenant-less upon its sale. Aetna maintains that to the extent that Abissi relied on the Tenant Comparables, his reliance served to inflate the Property's market value. According to Aetna, Abissi could only factor in the Tenant Comparables if he made a substantial

**2.** Our review of tax assessment appeals is limited to determining whether errors of law were committed, an abuse of discretion occurred, or constitutional rights were violated.

*Jackson v. Board of Assessment Appeals of Cumberland County*, 950 A.2d 1081, 1085 n. 4 (Pa.Cmwlth.2008).

downward adjustment to the market value of the Property.

■ In an assessment appeal, the trial court hears the matter *de novo* and, accordingly, is the ultimate finder of fact. *Parkview Court Associates v. Delaware County Board of Assessment Appeals,* 959 A.2d 515, 520 (Pa.Cmwlth.2008). In exercising its role as fact-finder, the duty of the trial court is to determine the property's current market value on the basis of competent, credible, and relevant evidence. *Gilmour Properties v. Board of Assessment Appeals of Somerset County,* 873 A.2d 64, 66 n. 3 (Pa.Cmwlth.2005).

■ Stated differently, the function of the trial court in a tax assessment case is not to independently value the property, but to weigh the conflicting testimony and values expressed by the competing experts and arrive at a valuation based on the credibility of their opinions. *Id.* Significantly, the trial court has exclusive province over all matters of credibility and evidentiary weight, *RAS Development Corp. v. Fayette County Board of Assessment Appeals,* 704 A.2d 1130, 1137 (Pa. Cmwlth.1997), and its findings will not be disturbed if they are supported by substantial evidence in the record. *Herzog v. McKean County Board of Assessment Appeals,* 14 A.3d 193, 200 (Pa.Cmwlth.2011).

■■ Nevertheless, as fact-finder, "the trial court must state the basis and reasons for its decision." *Green v. Schuylkill County Board of Assessment Appeals,* 565 Pa. 185, 772 A.2d 419, 433 (2001). If the trial court rejects an expert's testimony for specified reasons, an appellate court may review the validity of those reasons. *Masalehdan v. Allegheny County Board of Property Assessment, Appeals and Review,* 931 A.2d 122, 127 n. 3 (Pa.Cmwlth. 2007). Further, if an expert uses an improper factor when fixing the fair market value of real estate, his opinion is not substantial evidence that can support a finding of value. *Buhl Foundation v. Board of Property Assessment, Appeals and Review of Allegheny County,* 407 Pa. 567, 180 A.2d 900, 902 (1962).

■ Section 402(a) of the Assessment Law requires property to be assessed at its fair market value, 72 P.S. § 5020–402(a), and an expert's testimony as to comparables is admissible to establish a property's market value. *Schenley Land Co. v. Allegheny County Board of Property Assessment,* 205 Pa.Super. 577, 211 A.2d 79, 81 (1965) (citing *Deitch Co. v. Allegheny County Board of Property Assessment,* 417 Pa. 213, 209 A.2d 397 (1965)).

[I]n determining market value, 'comparables' means properties of a similar nature which have been recently sold. In order to be comparable ... however, the properties need not be identical. In reviewing sales of other properties, 'to compare' means to examine the characters or qualities of one or more properties for the purpose of discovering their resemblances or differences. The aim is to show relative values by bringing out characteristic qualities, whether similar or divergent. Thus, comparisons based on sales may be made according to location, age and condition of improvements, income and expense, use, size, type of construction and in numerous other ways.

*McKnight Shopping Center v. Board of Property Assessment, Appeals & Review,* 417 Pa. 234, 209 A.2d 389, 393 (1965) (citation omitted).

The courts of this Commonwealth have held that shared features between properties can render them substantially similar and able to be compared as a matter of law and that, generally, any dissimilarities is a matter that goes to the weight of the

evidence rather than its admissibility or competency. *See McKnight Shopping Center*, 209 A.2d at 393 (stating that properties need not be identical to be comparable and comparisons may be based, among other things, on sales according to similarities in use, size, and type of construction); *Pennypack Woods Home Ownership Association v. Board of Revision of Taxes*, 163 Pa.Cmwlth. 80, 639 A.2d 1302, 1306 (1994) (concluding that taxpayer's contention "that [the board's expert] did not take into account the differences between the newer units that he used as comparables and the older [taxpayer's] units" raised an issue of credibility). For instance, this Court in *Appeal of Avco Corporation, Lycoming County*, 100 Pa.Cmwlth. 616, 515 A.2d 335, 338 (1986), concluded: "Properties may be similar for comparison purposes without being identical, and the difference goes to the weight, *i.e.*, the persuasive quality, of the expert's testimony. Of course, the weight accorded to an expert's testimony is for the fact finder to determine."

■ Here, the Property has one owner Aetna, which is the sole tenant, and would be vacant upon its sale, while the Tenant Comparables had a tenant(s) in place at the time they were sold. Despite this difference, however, the Property is similar to the Tenant Comparables in the respect that all of them have commercial office buildings. (F.F. at 55, 56, 64, 81–82, 99–100, 102.) Abissi also testified, and the trial court found as fact, that in analyzing the Tenant Comparables, he placed the greatest emphasis on those Tenant Comparables that most closely resemble the Property in terms of size, use, and amenities. *See* F.F. at 11, 18–19 (Property's office building has 155,614 square feet, an employee cafeteria, general and private office space, and an open atrium space), *and compare with* F.F. at 55, 64, 82, 100, 102 (most significant Tenant Comparables had

109,271 and 142,000 square feet, respectively, and one had significant office space, a cafeteria, and a lobby). Given these basic physical similarities between the Property and the Tenant Comparables, we conclude that they were comparable as a matter of law. Although there may be instances where properties are too dissimilar to be realistically compared, we do not believe that this is that case.

Turning to Aetna's argument that Abissi was required to make an adjustment to the Property's market value because he used the Tenant Comparables, our decision in *In re Appeal of Property of Cynwyd Investments*, 679 A.2d 304 (Pa.Cmwlth.1996), is informative. In that case, the taxpayer argued that the testimony of the expert for the board of assessment was incompetent because the expert did not make an adjustment for leases encumbering the property. This Court disagreed, noting that the "expert testified that he did consider the existing leases but made no separate calculation in determining ... the market rental value of the property." *Id.* at 309.

We concluded in *Cynwyd Investments* that even if the leases would have had a significant impact on the property's market value, once the expert testified that he took the leases "into consideration but did not make an adjustment, this failure to make an adjustment, if anything, goes to the weight of his testimony and not its competency." *Id. See also id.* at 310 (reiterating that an allegation that an expert failed to properly consider a factor affecting the value of the property "goes only to the weight of the expert's testimony"). Because the trial court has exclusive control over the weight to be assigned to the evidence, this Court in *Cynwyd Investments* concluded that the trial court did not err in finding the testimony of the board's expert credible. *Id.* at 310.

In *Parkside Townhomes Association v. Board of Assessment Appeals of York County*, 711 A.2d 607 (Pa.Cmwlth.1998), this Court followed *Cynwyd Investments* and concluded that where the expert considered the effect that tax credits have on the property's sale price and determined that the tax credits were not relevant, the expert's "failure to make an adjustment of his appraisal goes to weight of the his testimony not its competency." *Id.* at 611–12.

In this case, Abissi testified that the owner-occupied nature of the building was a factor for valuation; explained that he used the Tenant Comparables because there were not many sales of owner-occupied buildings to compare; and affirmed that he considered making adjustments to the Property to account for this dissimilarity by utilizing an adjustment formula. (R.R. at 225a–26a, 267a; F.F. at 41, 46.) It is unclear, though, whether Abissi actually made adjustments after running them through his adjustment formula. *See* F.F. at 46; R.R. at 267a (testifying that tenant-occupied buildings "were considered in our analysis. We tried to take case [sic] of making adjustment for the sales, but then once the adjustments are made we still reconciled both the adjusted range and also the unadjusted range. We looked at both ranges in order to determine estimated value for the sales comparison approach.")

Nonetheless, as in *Cynwyd Investments* and *Parkside Townhomes Associates*, Abissi expressly considered the difference in occupancy between the Property and the Tenant Comparables at the time of sale. *See Parkside Townhomes Associates*, 711 A.2d at 611–12; *Cynwyd Investments*, 679 A.2d at 309–10.[3] Because Abissi considered the owner-occupied nature of the Property as a factor, his reliance on the Tenant Comparables does not render his testimony incompetent, and, to the extent that Aetna contests the amount of Abissi's adjustments or his failure to make adjustments, these contentions challenge the weight of the evidence. *Parkside Townhomes Associates*, 711 A.2d at 611–12; *Cynwyd Investments*, 679 A.2d at 309–10.

It is well-established that determination of evidentiary weight is a matter reserved exclusively to the trial court and that this Court cannot reverse such determinations. *See RAS Development Corp.*, 704 A.2d at 1137 ("[I]t is well-settled that all matters of credibility and evidentiary weight are

---

**3.** In *In Re Appeal of Johnstown Associates*, 494 Pa. 433, 431 A.2d 932 (1981), and *In re Appeal of Marple Springfield Center, Inc.*, 530 Pa. 122, 607 A.2d 708 (1992), our Supreme Court held that an appraiser must consider rental income restrictions and long term leases when determining fair market value. In 2003, section 402(c)(1) of The Assessment Law was amended to read: "In arriving at the actual value of real property, the impact of applicable rent restrictions, affordability requirements or any other related restrictions prescribed by any Federal or State programs shall be considered." Act of May 22, 1933, P.L. 853, *as amended*, added by the Act of December 3, 2003, P.L. 227, 72 P.S. § 5020–402(c)(1). In *1198 Butler Street Associates v. Board of Assessment Appeals*, 946 A.2d 1131, 1139 (Pa.Cmwlth.2008), this Court determined that "[t]he 2003 amendment to the Assessment Law is consistent with prior case law addressing the effects of rent restrictions," including *Johnstown Associates*.

Because the nature of the occupancy of the premises, *i.e.*, owner-occupied versus tenant-occupied, is not a legal restriction on the Property, much less one listed in section 402(c)(1), it does not appear that Abissi needed to expressly consider the distinction to render his testimony competent. However, we need not reach this issue, because Abissi considered the Property's owner-occupied use in relation to the tenant-occupied Tenant Comparables, and this consideration, alone, makes his testimony competent per *Cynwyd Investments*.

within the exclusive province of the trial court and that these determinations are binding on this Court."). Therefore, Aetna's contentions fail on the merits.

### The Transactional Comparables

Aetna contends that the trial court erred in accepting Abissi's opinion as credible because Abissi relied on the Transactional Comparables and these comparables were deficient as a matter of law. Particularly, Aetna contends that the Transactional Comparables were private transactions and were not "exposed to the market place for sale and thus not true comparables for purposes of establishing a market value for the [Property]." (Aetna's brief at 25.)

At one point in time in this Commonwealth:

By the Act of 1841 (May 15, 1841, P.L. 393, section 4), the tax assessors were commanded to fix the worth of properties 'according to the actual value thereof, and at such rates and prices for which the same would separately bona fide sell,' and the commissioners, as a board of revision, were directed (Act July 27, 1842, P.L. 445, section 13) to inquire whether the assessment was 'at a sum or price not less than the same would bring *after full public notice at a public sale.*'

*Kaemmerling's Appeal,* 282 Pa. 78, 127 A. 439, 440 (1925) (quoting the Acts of 1841 and 1842, emphasis added).

Our Supreme Court has consistently read the language in the Acts of 1841 and 1842 to mean that the "land must be assessed for what it would bring at a fair public sale after due notice." *Kemble's Estate,* 280 Pa. 441, 124 A. 694, 696 (1924). *See Washington County v. Marquis,* 233 Pa. 552, 82 A. 756, 758 (1912) (stating that "the acts of 1841 and 1842 ... require[d] the valuation to be fixed upon the basis of selling price at a bona fide sale after due

notice."). In the 1924 case of *Kemble's Estate,* the court reiterated that "[t]he market value of the separate tracts at public sale, after due notice, is the legal basis recognized by our statutes [for] determining the assessable value of real estate, and until the legislature changes this method, it is binding not only upon the taxing authorities but upon the courts as well." 124 A. at 695 (citation omitted). Nonetheless, even under the Acts of 1841 and 1842, evidence of private sales was competent and admissible to determine a property's fair market value at a public sale. *See Kemble's Estate,* 124 A. at 696–97 ("[The experts] mention at least four public sales of coal lands and a greater number of private sales, some very recent and in close proximity to the land in question. This fully qualified them to express opinions as to market value.").

Since then, the Acts of 1841 and 1842 have been repealed, and the legislature enacted The Assessment Law in 1933. In pertinent part, section 402(a) of the Assessment Law states that for assessment purposes, the appraiser shall "rate and value all objects of taxation ... according to the actual value thereof, and at such rates and prices for which the same would separately bona fide sell." 72 P.S. § 5020–402(a).

In interpreting section 402(a) of the Assessment Law, our Supreme Court has repeatedly defined fair market value as "the price which a purchaser, willing but not obliged to buy, would pay an owner, willing but not obliged to sell, taking into consideration all uses to which the property is adapted and might in reason be applied." *Buhl Foundation,* 180 A.2d at 902. The Supreme Court has also elaborated that:

In determining market value many factors may be relevant. ... But all the elements considered must be directed to

determining the value of the property in the market, a determination which is not controlled by any single factor and which is ultimately made on the basis of competent testimony as to what the property is worth in the market at a fair sale.

*Park Drive Manor Tax Assessment Case,* 380 Pa. 134, 110 A.2d 392, 394 (1955). *See Buhl Foundation,* 180 A.2d at 902 ("The actual or fair market value, while not easily ascertained, is fixed by the opinions of competent witnesses as to what the property is worth on the market at a fair sale.").

■ Because courts have previously determined that evidence of private sales is admissible to determine fair market value, and market value is dependent on expert testimony and the sole, express condition that it be based upon a "bona fide" or "fair" sale, we reject Aetna's apparent argument that only sales consummated through a public auction and/or public advertisements can be considered as comparables.

■ In this case, Abissi testified, and the trial court found as fact, that he gathered sales information by calling either the buyer, seller, or broker and confirmed that the Transactional Comparables were executed at "arm's length." (F.F. at 49, 50.) This is all that is required under section 402(a) of the Assessment Law for a comparable to be relevant to a subject property's market value—a "sale" that is "bona fide."

■ On this note, the particular manner through which a comparable property has been sold, *e.g.,* a newspaper, an internet site, flyers, a public auction, mortgage foreclosure, word of mouth, or some other transaction recognized at law, is an issue that most appropriately concerns the weight of the evidence rather than its competency. This is because regardless of the form or circumstances giving rise to the transaction, the comparable property is nonetheless being transferred pursuant to a "sale"—that is, an exchange of property for some form of consideration.[4] Therefore, we conclude that the three particular transactions comprising the Transactional Comparables—a 1031 Exchange, a sale-leaseback agreement, and an option-to-purchase agreement—are competent comparables as a matter of law and may be used to determine the Property's market value, so long as these sales are found to be "bona fide" or "fair."

Our conclusion finds strong support from the decisions of foreign jurisdictions which have concluded, in analogous situations, that properties sold pursuant to a 1031 Exchange, a sale-leaseback agreement, and an option-to-purchase agreement do not reflect a distorted market value and can be used as comparables to determine another property's market value. *See, e.g., Daniels v. Holtz,* 794 N.W.2d 813, 819 (Iowa 2010) ("Because a like-kind property exchange [under 26 U.S.C. § 1031] only defers tax liability, it does not necessarily affect a fair market value"); *Cincinnati Trophy, LLC v. Board of Education,* Appeal No. C–120806, 2013–Ohio–5387, 2013 WL 6535475 (Ohio Ct.App., filed December 11, 2013) (unreported), slip op. at ¶¶ 22–24 (concluding that while evidence that a purchaser was motivated by tax benefits under 26 U.S.C. § 1031 may call into question the reliability of the sales price as reflective of market value, the sale price is still admissible and competent evidence when the exchange was done at arm's length); *Darcel, Inc. v. Manitowoc*

---

4. To be sure, if Aetna's position were accepted by this Court, the courts would have to grapple with difficult subsidiary issues such as to what extent or in what mediums must the sale be exposed to the public in order to constitute a competent comparable.

*Review Board,* 137 Wis.2d 623, 405 N.W.2d 344, 347 and 350–51 (1987) (stating that sale-leaseback agreement situations may be considered as a factor in determining market value if it is an arms-length transaction); *Spector Terminals, Inc. v. Nordonia Hills School District Board of Education,* 10 Ohio App.3d 194, 461 N.E.2d 16, 18 (9th Dist.1983) (concluding that sale-leaseback arrangement was proper evidence of another property's fair market value); *State ex rel. Geipel v. City of Milwaukee,* 68 Wis.2d 726, 229 N.W.2d 585, 589–90 (1975) (concluding that an option to purchase is "a sale for purposes of valuation," should not "be treated differently from other sales merely because it is an option to purchase," and the agreed upon price in the option is an indicator of market value); *see also Little Egg Harbor Township v. Bonsangue,* 316 N.J.Super. 271, 720 A.2d 369, 374 (Ct.App.Div.1998) (citation omitted) ("[I]n the absence of a completed sale, evidence of the price agreed upon in a binding contract of sale for property between the owner and a purchaser, both acting in good faith, would be of substantial significance in arriving at the fair market value of such property.") (citation omitted).

■ Although we conclude that the Transactional Comparables are competent evidence as a matter of law, this does not mean that they must be accepted as credible or afforded significant evidentiary weight. Of course, as in all sales, there may be situations in which the circumstances surrounding the sale demonstrate that the sale price is not a reliable indicator of fair market value or that the sale is not "bona fide." In this regard, it is up to the parties to litigate the issue through evidentiary presentation, and we leave it to the sound discretion of the trial court to decide whether a transactional exchange should be excluded or inadmissible as a comparable sale based upon that court's credibility and/or weight determinations.

As noted above, the trial court found that the Transactional Comparables were executed at "arm's length" and were indicative of fair market value. Aetna does not challenge the evidentiary support for this finding, and we accept it as binding for purposes of this appeal. *See Polinsky v. Department of Transportation,* 131 Pa. Cmwlth. 83, 569 A.2d 425, 428 n. 3 (1990) (stating that where an appellant does not challenge a trial court's finding of fact that finding is conclusive on appeal). Consequently, Aetna's argument does not merit relief.

### Market Stabilization

In a three-fold fashion, Aetna argues that the trial court erred in accepting Abissi's expert opinion that the market for the Property has stabilized.

First, Aetna contends that because Abissi impermissibly relied on the Tenant and Transactional Comparables, the trial court lacked substantial evidence to determine market stabilization.

Second, Aetna contends that the trial court erred in rejecting Patcella's testimony that the market is in a state of decline and devotes a significant portion of its brief attempting to explain why Patcella's opinion is more sound or persuasive than Abissi's. For support, Aetna cites testimony from Patcella that the vacancy rate for the Blue Bell area was an unprecedented 20% and evidence that Patcella relied on a larger quantity of comparables and recent sales than Abissi.

Third, Aetna claims that "Abissi simply ignored the realities of the market place and concluded, without evidentiary support, that the marketplace has stabilized." (Aetna's brief at 30.) According to Aetna, "it was incumbent upon Abissi to provide evidence, through appropriate sales com-

parables, that the market prices of the sales comparables in the earlier tax years were supported by sales in the later tax years" and "[n]o such evidence was presented at trial." (*Id.*) More specifically, Aetna argues that Abissi's testimony lacked foundation because he only relied upon two new sales for the 2012 tax year, one new sale for the 2013 tax year, and no new sales for the 2014 tax year.

With respect to Aetna's first argument, this Court summarily dismisses it, having already concluded that the Tenant and Transactional Comparables were competent comparables.

 Concerning Aetna's second argument, the trial court was free to assign any weight it chose to the testimony of the parties' experts, and the trial court's resolution of the conflicting testimony, finding the testimony of Abissi credible and more persuasive than the testimony of Patcella, constitutes a credibility determination that is not subject to appellate review. *See Church Street Associates v. County of Clinton*, 959 A.2d 490, 495 (Pa.Cmwlth. 2008) (concluding that the trial court's "resolution of the conflicts within the two experts' testimony, as well as the weight assigned respectively thereto and the credibility determinations thereof, control on appeal."). No matter how superior Aetna views Patcella's testimony when compared to Abissi's testimony, it is well-settled that a trial court does not abuse its discretion simply because it decides not to believe an expert's testimony. *See Cynwyd Investments*, 679 A.2d at 309–10. As recounted in its findings of fact, the trial court enunciated numerous, sufficient reasons to find Patcella's testimony not credible. *See, e.g.*, F.F. at 67–68, 134, 136–38.

Moreover, to the extent that Aetna could be deemed to have asserted that Abissi's testimony on market value was incompetent, we disagree.

 In a tax assessment case, the testimony of a qualified expert appraiser who recites the factors considered and the conclusions arrived at therefrom is generally deemed competent. *Cynwyd Investments*, 679 A.2d at 309. Here, Abissi testified that in determining whether the office market has stabilized, he considered whether vacancy rates are increasing, decreasing or staying the same; whether there is absorption of existing space; whether there is new construction; and whether rental rates are decreasing or increasing. Based upon these factors, Abissi ultimately opined that the market stabilized between 2012 and 2013. (F.F. at 124–25.)

Given this foundation, we conclude that Abissi's testimony regarding market stabilization constituted competent evidence. Even at their greatest force, Aetna's arguments merely contest Abissi's methodology, which, again, is a concern for the trial court that goes to the weight of the evidence, as opposed to its admissibility or competency. *See Parkview Court Associates v. Delaware County Board of Assessment Appeals*, 959 A.2d 515, 521 (Pa. Cmwlth.2008) (concluding that argument challenging an expert's methodology "essentially seeks a new credibility finding . . . which is inappropriate on appeal.").

Finally, regarding Aetna's third argument, it is questionable whether Abissi's testimony on market stabilization needed to be supported by comparable sales as the above factual foundation appears adequate to independently support the admission of his testimony on the subject of market stabilization. Nonetheless, although Abissi did not rely on any comparable sales for the 2014 tax year in arriving at a fair market value for that year, his usage of new sales for the 2012 and 2013 tax years are close enough in time for him to make a

determination of fair market value for the 2014 tax year. *See Pittsburgh Des Moines Steel Co. v. Board of Property Assessment, Appeals and Review of Allegheny County,* 103 Pa.Cmwlth. 61, 519 A.2d 1080, 1081 (1987) ("A sale of comparable property, if not too remote in time, has probative value and is admissible in evidence to determine the fair market value of the subject property."); *see also McGraw Edison v. Washington County Board of Assessment Appeals,* 132 Pa.Cmwlth. 437, 573 A.2d 248, 251 (1990) ("[T]he question of remoteness generally goes to the weight of the evidence, a matter committed to the trial court's discretion."). Accordingly, Abissi's opinion is further supported by the fact that Abissi utilized comparables that were close in time to his opinions of when the market stabilized and how that stabilization resulted in a relatively stagnate fair market value for the Property during tax years 2012 through 2014. *See* F.F. at 125.

For these reasons, we conclude that Aetna's arguments regarding market stabilization lack merit.

### Conclusion

Based on the above, the Tenant Comparables and the Transactional Comparables are competent comparables, as a matter of law, and the trial court did not err in crediting Abissi's expert testimony because he relied, in part, on these comparables in rendering his opinion on fair market value. We further conclude that Abissi's testimony on market stabilization constituted competent evidence and reject Aetna's arguments to the contrary. Accordingly, we affirm.

### *ORDER*

AND NOW, this 12th day of March, 2015, the June 25, 2014 order of the Court of Common Pleas of Montgomery County is affirmed.