**In re APPEAL OF/PROPERTY OF CYNWYD INVESTMENTS from the Decision of the Board of Assessment Appeals of Bucks County in Connection with Premises Situated at NE Corner Street Road & Marwin Avenue, Bensalem Township, Pennsylvania Relating to 1994 Subsequent Assessments During Pendency of the Appeal Folio No. 02–066086–011.**

**Appeal of CYNWYD INVESTMENTS, Appellant.**

Commonwealth Court of Pennsylvania.

Argued June 13, 1996.

Decided July 16, 1996.

---

Joseph Patrick O'Brien, for Appellant.

John P. Koopman, for Appellee.

Before PELLEGRINI and FRIEDMAN, JJ., and MIRARCHI, Senior Judge.

PELLEGRINI, Judge.

Cynwyd Investments (Taxpayer) appeals from an order of the Court of Common Pleas of Bucks County (trial court) establishing the fair market value of their property for the purpose of real estate taxes at $1,375,000 for the years 1994 and 1995.

Taxpayer is the owner of warehouse property containing 75,510 square feet located on 5.635 acres in Bucks County. The Board of Assessment Appeals of Bucks County (Board) assessed the property for tax years 1994 and 1995 at $1,413,000. After the Board denied Taxpayer's appeal of the assessment, Taxpayer appealed the assessment to the trial court.

Before the trial court, both parties called real estate experts to establish the fair market value of the property. George Sengpeil, the Board's expert, testified that he used the market data approach and the income capitalization approach to calculate the fair market value for the 1994 and 1995 tax years. He testified that the fair market value of the property for both years using the market approach was $1,415,000, and under the income capitalization approach, it was $1,395,-462.

Under the income capitalization approach, the approach at issue in this appeal, the Board's expert estimated the market rental value of the property at $3.00 per square foot, and multiplied this amount by the square footage of the property to arrive at an annual gross income stream of $226,530. This amount was then reduced by estimates for vacancy and credit losses, as well as management, commission and replacement reserve expenses to arrive at annual net income of $167,542. He then determined that an appropriate capitalization rate for a ten-year holding period was 12.0062 percent, and by dividing the annual net income by this rate concluded that the fair market value of the property was $1,395,462. Then, weighing the results of both approaches, the Board's expert concluded that the fair market value of the property was $1,400,000.

Taxpayer's expert, John J. Coyle, 3d., utilized the market data approach, the cost approach and the income capitalization approach for the 1994 tax year, and employed the market data and income capitalization approaches for 1995. Taxpayer's expert opined that for 1994, the fair market value of the property under the market data ap-

proach was $1,095,000, and under the cost approach was $1,151,000.

In employing the income capitalization approach for 1994, he estimated the market rental value of the property at $2.75 per square foot, and multiplying the square footage of the property by this estimate, arrived at an annual gross income stream of $207,700. This amount was then reduced by an allowance for vacancy, as well as estimated expenses for management, vacancy costs and replacement reserves to arrive at an annual net income of $115,000. Determining that an appropriate capitalization rate for a ten-year holding period was 10.30 percent, Taxpayer's expert divided the annual net income by this rate and arrived at a fair market value of $1,115,000. However, unlike the Board's expert, Taxpayer's expert made one additional adjustment to this amount.

Comparing the difference between the actual contract rents encumbering the property to the market rental rate, he determined that reduced to present value, the actual rental income exceeded the market rental income by $15,628, and added this amount to the $1,115,000 figure to arrive at a total of $1,130,628 as the fair market value under the income approach. Reconciling the three approaches, he determined that the fair market value of the property for 1994 was $1,130,000.

For 1995, Taxpayer's expert did not use the cost approach, but employed only the market data and income capitalization approaches. He opined that the fair market value under the market data approach was $1,055,000. Under the income capitalization approach, Taxpayer's expert estimated the market rental value at $2.65 per square foot, which yielded an annual gross income stream of $200,100. Reducing this amount by an estimated allowance for vacancy and expenses for management, vacancy costs and replacement reserves, he arrived at an annual net income of $108,000. Applying a capitalization rate of 10.20 percent, Taxpayer's

expert arrived at a fair market value of $1,060,000. He then, as in the 1994 calculation, made a comparison of the contract rent of the leases encumbering the property to the market rent, and concluding that the actual rents, reduced to present value, were $30,800 less than market rents, deducted this amount to arrive at a fair market value under the income capitalization approach of $1,029,200 for 1995. Reconciling the three approaches, Taxpayer's expert opined that the fair market value of the property was $1,030,000.

■ Before the trial court, Taxpayer contended that the Board's expert's testimony was incompetent because his estimate of the fair market value of the property did not consider actual rental rates of the leases encumbering the property. Rejecting this argument and giving due consideration to each expert's testimony, the trial court concluded that the fair market value of the property for both 1994 and 1995 was $1,375,000. This appeal followed.[1]

## I.

■ For assessment purposes, property is valued at "the actual value thereof, and at such rates and prices for which the same would separately sell." Section 402 of the General County Assessment Law, Act of May 22, 1933, P.L. 853, *as amended*, 72 P.S. § 5020–402. "The term actual value means market value and market value has been defined as the price which a purchaser, willing but not obliged to buy, would pay an owner, willing but not obliged to sell, taking into consideration all uses to which the property is adapted and might in reason be applied." *Deitch Co. v. Board of Property Assessment*, 417 Pa. 213, 217, 209 A.2d 397, 400 (1965).

■ The three approaches to determine

1. Our scope of review in a tax assessment appeal is narrow. The verdict of the trial court will be affirmed unless it is not supported by substantial evidence, the court abused its discretion or committed an error of law. The trial court is the finder of fact, determining the weight to be given to an expert witness's testimony regarding valua-

tion. The trial court's findings are entitled to great deference and the trial court's decision will not be disturbed unless there is clear error. *In re Appeal of V.V.P. Partnership*, 167 Pa.Cmwlth. 282, 647 A.2d 990 (1994), *petition for allowance of appeal denied*, 540 Pa. 615, 656 A.2d 120 (1995).

market value are the cost,[2] market data,[3] and the income capitalization approach. *Pennypack Woods Home Ownership Association v. Board of Revision of Taxes,* 163 Pa.Cmwlth. 80, 639 A.2d 1302, *petition for allowance of appeal denied,* 539 Pa. 669, 652 A.2d 839 (1994). As both appraisers did in this case, when arriving at an opinion of market value, appraisers will use more than one approach to value. Most times, the appraiser will come up with similar but different values under each approach. To arrive at an overall opinion of market value, an appraiser will reconcile those different values to arrive at a final overall opinion of market value based upon the applicability and significance of the value arrived at by each approach to value.[4]

■ Because the property was income producing, both experts testified that in reconciling their different values, they gave the most weight to the income capitalization approach, the most appropriate method for valuing income producing property. Under that approach, the annual net rental income expected from the property is divided by the investment rate of return, or capitalization rate, to arrive at the fair market value of the property. *Cedarbrook Realty, Inc. v. Cheltenham Township,* 148 Pa.Cmwlth. 310, 611 A.2d 335 (1992), *petition for allowance of appeal denied,* 533 Pa. 637, 621 A.2d 582 (1992).

■ At issue in this case is how to determine net rental income in the income capitalization approach when the existing lease, i.e.,

contract rent[5] is not the same as the market rent.[6] Normally, the amount of rent contained in a lease will affect the value of the real estate only if it meets two conditions. First, the remaining term of the lease must be of adequate length so that if the property were placed on the market, a potential purchaser would recognize the lease and be willing to pay more or less for the property because of its existence than if the property were unencumbered by the lease. Secondly, the contract rent must be either higher or lower than existing market rent. Again, the difference between the contract rent and the market rent must be large enough to affect what an able and willing buyer would pay for the property. *See* J.D. Eaton, Real Estate Valuation in Litigation, p. 293, American Institute of Real Estate Appraisal (1982).

The income capitalization adjustments made by the Taxpayer's expert shows that the difference between contract rent and market rent rates is not significant enough to influence the decision of a willing buyer. For the 1994 tax year, the Taxpayer's expert adjusted the fair market value *upward* $15,-628, and for the 1995 tax year, reduced the fair market value by only $30,800. These adjustments *increased* Taxpayer's fair market value by 1.4 percent in 1994, and only decreased the fair market value by 2.9 percent in 1995. If a similar adjustment was made to the Board's expert's opinion, the percentages would not be materially different. As the trial court implicitly found, such

**2.** The cost approach values the property by considering the reproduction or replacement cost of the property, less depreciation and obsolescence. 72 P.S. § 5020–402. Specifically, this method entails (1) estimating the value of the land assumed vacant and available for its highest and best use; (2) estimating the reproduction cost or cost new of the facility; (3) subtracting from the latter amount the facility's depreciation; and (4) adding to this depreciated balance the value of the land estimated in (1) above. *Reichard–Coulston, Inc. v. Revenue Appeals Board of Northampton County,* 102 Pa.Cmwlth. 227, 517 A.2d 1372 (1986), *petition for allowance of appeal denied,* 517 Pa. 611, 536 A.2d 1335 (1987).

**3.** The market data approach compares the subject property to several similar properties with due consideration given to the size, age, physical condition, location and other relevant factors. *Cedarbrook Realty, Inc. v. Cheltenham Township,*

148 Pa.Cmwlth. 310, 611 A.2d 335 (1992), *petition for allowance of appeal denied,* 533 Pa. 637, 621 A.2d 582 (1992).

**4.** Not all three approaches to value have to be used in determining market value. *Marx v. Board of Property Assessment, Appeals and Review of Allegheny County,* 31 Pa.Cmwlth. 496, 377 A.2d 199 (1977).

**5.** Contract rent is "[t]he actual rental income specified in a lease." American Institute of Real Estate Appraisers, The Dictionary of Real Estate Appraisal, p. 71 (1984).

**6.** Market rent is "[t]he rental income that a property would most probably command in the open market; indicated by current rents paid and asked for comparable space as of the date of the appraisal." *Id.*

a small change would be unlikely to change the decision of a willing buyer.

■ The Board's expert testified that he did consider the existing leases but made no separate calculation in determining that the market rental value of the property was $3.00 per square foot.[7] Even if the difference between contract rent and market rent would have been significant, once he testified that he took contract rent into consideration but did not make an adjustment, this failure to make an adjustment, if anything, goes to the weight of his testimony and not its competency. *See Appeal of Mellon Bank, N.A.,* 78 Pa.Cmwlth. 463, 467 A.2d 1201 (1983).

■ Even though it has a minuscule effect on overall fair market value and normally would not go to competency, Taxpayer contends that under our Supreme Court's decision in *In re Appeal of Marple Springfield Center, Inc.,* 530 Pa. 122, 607 A.2d 708 (1992), the fair market value of the property must take into consideration existing leases, and the appraiser must include a specific adjustment to take into consideration of the difference in contract rents and market rents even for short term leases. Because the Board's expert did not make such a calculation, Taxpayer contends that the Board's expert's testimony is incompetent.[8]

Our Supreme Court first addressed the effect of rental income restrictions on the valuation of property for tax assessment purposes in *In re Appeal of Johnstown Associates,* 494 Pa. 433, 431 A.2d 932 (1981). In that case, rents in a subsidized housing project were fixed by the Department of Housing and Urban Development at a rate below the prevailing rate for comparable non-subsidized units in a long term arrangement in return for a subsidized mortgage. The landowner argued that the rent restrictions should be considered in valuing the property. Our Supreme Court agreed, holding that the certitude that the property did not have the potential for rental profit increases must at least be considered.[9]

In *Marple,* our Supreme Court extended the reasoning of *In re Johnstown* to long term leases.[10] In that case, a large portion of the property that was the subject of the appeal was encumbered by a 76–year lease at a fixed rate which the landowner's predecessor in interest had made. The court held that the reasoning of *In re Johnstown* should be applied because the fee simple was so encumbered that a buyer of the remainder could not anticipate income at current market levels.

Nothing in *Marple* suggests that its treatment of long term leases is mandatory in determining the fair market value of proper-

7. Mr. Sengpeil testified on direct examination concerning his rental rate estimate in the income capitalization approach as follows:
   Q: What is the first step which you took in the formulation of your income and capitalization of this property?
   A: Estimated the potential gross income of the property.
   Q: In what manner and how did you go about that Mr. Sengpeil?
   A: Well, I did it in two steps. One, I considered the leases that were in effect as of the time of the appraisal. And secondly I looked at the market place to determine what the property could rent for under normal conditions.
   (Trial court transcript, p. 104).

8. In a tax assessment case, the testimony of a qualified expert appraiser who recites the factors considered and the values arrived at therefrom is competent. *Appeal of Rieck Ice Cream,* 417 Pa. 249, 209 A.2d 383 (1965).

9. *Johnstown* held, however, that the depreciated tax shelter benefits associated with owning this

type of property could be taken into consideration. 431 A.2d at 935. Nothing in that opinion precludes inclusion in the income stream benefits derived from the federally subsidized mortgage rate of only one percent given in exchange for lower rent.

10. *Marple* has been criticized because, as a result, two identical properties could be paying different amounts in real estate taxes depending on the business decisions of the owners of the property. *Marple* only held, however, that it was improper to use market rents when a property is encumbered by a long term lease. It did not preclude the inclusion of the leasehold interest in fair market value. "The sum of values of the fee subject to the leases and leasehold interest tend to be the same as the value of the property free and clear." American Institute of Real Estate Appraisers, The Appraisal of Real Estate, p. 469 (7th Ed.1978). If, when and how a long term lease can be included in a fair market value for assessment purposes need not now be addressed.

ty when all that is involved are the typical short term leases that make up the rent rolls of a commercial building. Whether a short term lease has to be considered is determined by whether it is significant, and then the failure to consider it properly goes only to the weight of the expert's testimony, not its competency. Accordingly, as the trial court held, *Marple* applies only when a long term lease so affects the fee simple that it must be taken into account separately in determining the fair market value.

## II.

■ Taxpayer also argues that because the Board's expert employed unreasonably low estimates of the repair and renovation costs, the trial court erred in considering the report and testimony of the Board's expert. The major difference in costs estimated by the parties are that Taxpayer's estimated annual renovation and repair costs are at $56,700, whereas the Board estimated these costs at $15,102.[11] Taxpayer argues that because prudent management dictates that it continue to set aside reserves for renovation for new tenants, its estimate of repair and renovation costs are accurate and the Board's estimate is wrong because they fail to account for these costs. The trial court was free to assign any weight it chose to each

party's estimate of repair and renovation costs, and, in fact, any other estimates made by each party. Simply because the trial court chose not to believe Taxpayer's figure does not mean that it abused its discretion. *In re Appeal of Township of Ross*, 88 Pa. Cmwlth. 618, 491 A.2d 929 (1985).

Because the trial court was not required to base its determination of the actual value of the property on the leases encumbering the property and because the trial court was free to assign any weight it chose to the estimates of costs made by the parties, it did not commit an error of law or abuse its discretion in its determination of the value of Taxpayer's property. Accordingly, we affirm the decision of the trial court.

## ORDER

AND NOW, this 16th day of July, 1996, the order of the Court of Common Pleas of Bucks County at No. 93–10294 dated July 25, 1995, is affirmed.

---

**11.** Taxpayer also asserts that the Board's expert erred because he did not take into account Taxpayer's expenses that it must absorb due to vacancies, which is shown in Taxpayer's direct income capitalization calculations as $8,300 for each year as "vacancy costs" in the expense section. However, while the Board's expert's calculation contains no "vacancy costs" in the expense section, it does contain $9,000 of expenses for what it terms "commissions" which are not contained in the Taxpayer's expert's calculations. Consequently, the net difference between these two line items is only $700, and despite the differences in labeling of the expense line items, the major difference in the estimates of expense is in the reserve for repairs and renovations. Moreover, as the trier of fact, the trial court was free to assign whatever weight it chose to these estimates of expense.