Martin P. Mariano and Beverly A.    :
Mariano,    :
            Appellants    :
    :
           v.    :
    :
Wyoming County Board of Assessment  :
Appeals & Revision of Taxes, Wyoming :
County, Tunkhannock Area School    :    No. 2489 C.D. 2015
District and Tunkhannock Borough    :    Argued: June 9, 2016

BEFORE:   HONORABLE P. KEVIN BROBSON, Judge
              HONORABLE ANNE E. COVEY, Judge
              HONORABLE DAN PELLEGRINI, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                      FILED: July 5, 2016

          Martin P. Mariano and Beverly A. Mariano (collectively, Taxpayers) appeal from the Common Pleas Court of the 44th Judicial District (Wyoming County Branch's) (trial court) October 9, 2015 order and October 29, 2015 amended order in favor of the Wyoming County Board of Assessment Appeals & Revision of Taxes (Board), the Tunkhannock Area School District, Wyoming County and Tunkhannock Borough (collectively, Taxing Authority), setting the fair market value of the Taxpayers' property at $5,650,000.00 as of September 1, 2012, $5,850,000.00 for tax year 2014, and $6,220,000.00 for tax year 2015. The Taxpayers present three issues for this Court's review: (1) whether the trial court erred by crediting the Taxing Authority's appraiser Blair Bates' (Bates) valuation opinion which was based on out-of-market comparables and contained miscalculations; (2) whether the trial court erred by crediting Bates' valuation opinion based upon a cost multiplier for the cost approach that was not facility-

specific; and, (3) whether the trial court erred by crediting Bates' opinion whose sales comparison approach failed to make appropriate adjustments to reflect the differences among out-of-market comparables. After review, we affirm.

Taxpayers own a 27.94-acre parcel of real property located in Tunkhannock Township, Wyoming County,[1] situated within the Tunkhannock Area School District (Property). The Property contains a single-story building specifically designed as a medical clinic consisting of 25,800 square feet of leasable space and a parking lot for approximately 161 cars. The building is occupied by Geisinger Clinic (Geisinger) under a 15-year lease effective November 1, 2006. According to Taxpayers, the building was a "design-build project," in that Taxpayers purchased the Property for the purpose of constructing a building to Geisinger's particular specifications, and the costs associated with the Property's acquisition and the building's construction were incorporated into Geisinger's lease rate.[2] *See* Reproduced Record (R.R.) at 59a.

The Board's 2013 tax year assessment of the Property was $1,140,270.00, which consisted of $72,950.00 for the land and $1,067,320.00 for the improvements. Taxpayers appealed, seeking a reduction in the assessment. The Board denied Taxpayers' appeal. Taxpayers appealed to the trial court and the trial court held a non-jury trial on May 27 and September 30, 2015.

During the trial, Taxpayers offered the testimony of appraiser Frederick Lesavoy (Lesavoy). Lesavoy used both the sales comparison and income approaches to valuation. Although Lesavoy considered the cost approach, he did not believe it was applicable in this instance "due to the difficulty in reliably estimating depreciation . . . , the fact that market conditions don't warrant new

---

[1] Wyoming County is a Seventh Class County.

[2] Taxpayers also represent that the construction of a medical clinic is far more costly to build than a traditional professional office building. *See* Reproduced Record at 61a.

2

construction at this time, and the fact that an income-producing property's cost is not necessarily consistent with its value." R.R. at 553a.

Lesavoy considered comparable sales, but admitted that none of the comparables were as new as or newer than the Property. Lesavoy explained that there were no such buildings in the area, and that

> the most important factor is that you use sales that are within a relative[ly] similar kind of marketplace. I mean, I could go to Philadelphia and use sales from Philadelphia that are new that are built in 2006, but the marketplace there is a multimillion population. Lehigh Valley, hundreds of thousands of people. Bethlehem, Reading, these other areas, there are sales that occurred that are of newer buildings, but more important than it being new is where it is. . . . We must stay within somewhat of rural areas and that's why I selected these sales.

R.R. at 217a-218a.

Lesavoy also considered the income approach to valuation. In developing the income approach, Lesavoy declined to use the contract rental rate to determine market value since, in Lesavoy's opinion, the design-build nature of the project rendered the contract rental rate an inaccurate value measure.[3] Instead, Lesavoy developed a hypothetical rental rate for the Property, using leases for similar buildings located in comparable neighborhoods.

The Taxing Authority offered the testimony of Bates, who used all three approaches to develop the Property's market value. In developing the sales comparison approach, Bates explained:

> One of the things that I looked at in finding sales that I wanted to consider to compare with the subject property

---

[3] Because Geisinger's lease was based on costs associated with acquiring the Property and constructing the facility, Lesavoy believed the contract rental rate was above-market and would result in an inaccurate valuation.

3

was comparability. Not so much comparability of location, as [Lesavoy] focused on, but comparability of function. We have a medical clinic building . . . the one and only medical clinic in Wyoming County. You have to find similar clinic buildings, if you can find them, and adjust for location[.]

R.R. at 286a-287a. He further stated:

The specific criteria that I used for choosing sales, . . . [was] medical office or clinic use. . . . Building size of 10,000 square feet or larger, leased ideally to a credit worthy tenant, a large hospital, or government agency. That wasn't always possible. This is what I was looking for, and recently constructed or renovated, between zero and fifteen years old. So, I wanted newer buildings, contemporary design, with good, solid tenancy.

R.R. at 288a.

Bates also considered the cost approach. He explained:

[I]f you're starting on the cost approach, the first thing you do is estimate the value of the underlying land as if vacant, looking at, when they're available, land sales. Then you estimate the replacement cost new for the subject improvements. From that, you subtract depreciation leading to a depreciated replacement cost new. Add that land value previously estimated and you have an estimate of market value by the cost approach.

R.R. at 280a-281a. He also related that:

Source for my costs in all cases was the Marshall valuation service. I show that at the bottom of each cost summary page. [The] Marshall [V]aluation [S]ervice [(Marshall & Swift)] section page, date, and everything was adjusted to a current value. The – if you look at the – toward the top of the page, there are – there's a – the left[-]hand column entitled multipliers and there's a current cost and local area of multipliers. The current cost is the technique we use to bring value forward or backward from the date of publication of the Marshall service.

R.R. at 284a.

4

Finally, regarding the income approach to valuation, Bates explained:

> [T]he income approach I developed was based on a leased fee, that is, the rental contract between [Geisinger] and Mr. Mariano so we have . . . a property which is subject to this contract. It prescribes what can be done and what must be paid in order to do it in that building.

R.R. at 294a-295a. Bates did not consider a hypothetical market rent since "[t]he hypothetical market rent was not necessary because we had a real contract rent. We know what it's going to be for the next couple of . . . years[.]" R.R. at 298a.

On October 9, 2015, the trial court issued an order setting the fair market value of the Property for the 2014 tax year at $5,850,000.00, and the fair market value of the Property for the 2015 tax year at $6,220,000.00. On October 29, 2015, the trial court issued an amended order setting the fair market value of the Property as of September 1, 2012 at $5,650,000.00. Taxpayers appealed to this Court.[4]

> Initially,

> [S]ection 402(a) of The General County Assessment Law (Assessment Law), Act of May 22, 1933, P.L. 853, *as amended,* 72 P.S. § 5020–402(a), identifies **three methods** of property valuation that **must be considered in conjunction with one another when arriving at fair market value for assessment purposes: cost approach, income approach, and comparable sales approach**.

> The cost approach considers reproduction or replacement costs of the property, less depreciation and obsolescence. The income approach determines fair market value by dividing the subject property's annual net rental income by an investment rate of return. The comparable sales

---

[4] "Our review of tax assessment appeals is limited to determining whether errors of law were committed, an abuse of discretion occurred, or constitutional rights were violated." *Aetna Life Ins. Co. v. Montgomery Cnty. Bd. of Assessment Appeals*, 111 A.3d 267, 278 n.2 (Pa. Cmwlth. 2015).

5

approach compares the subject property to similar properties with consideration given to size, age, physical condition, location, and other factors.

*Aetna Life Ins. Co. v. Montgomery Cnty. Bd. of Assessment Appeals*, 111 A.3d 267, 278 (Pa. Cmwlth. 2015) (citations omitted; emphasis added).

The Pennsylvania Supreme Court has explained:

In an assessment appeal, the matter before the trial court is heard *de novo,* and the order of proof is well settled.

> The procedure requires that the taxing authority first present its assessment record into evidence. Such presentation makes out a *prima facie* case for the validity of the assessment in the sense that it fixes the time when the burden of coming forward with evidence shifts to the taxpayer. If the taxpayer fails to respond with credible, relevant evidence, then the taxing body prevails. But once the taxpayer produces sufficient proof to overcome its initially allotted status, the *prima facie* significance of the [b]oard's assessment figure has served its procedural purpose, and its value as an evidentiary devise is ended. Thereafter, such record, of itself, loses the weight previously accorded to it and may not then influence the court's determination of the assessment's correctness.
>
> [T]he taxpayer still carries the burden of persuading the court of the merits of his appeal, but that burden is not increased by the presence of the assessment record in evidence.
>
> Of course, the taxing authority always has the right to rebut the owner's evidence and in such a case the weight to be given to all the evidence is always for the court to determine. The taxing authority cannot, however, rely solely on its assessment

6

> record in the face of countervailing evidence unless it is willing to run the risk of having the owner's proof believed by the court.

[*Deitch Co. v. Bd. of Prop. Assessment,*] 209 A.2d [397,] 402, [(Pa. 1965)] (citations and footnote omitted).

The trial court's statutory mandate, as established in the . . . Assessment Law, is to hear the evidence and to 'make such orders and decrees . . . as . . . may seem just and equitable. . . .' 72 P.S. § 5020-518.1(a). The Fourth to Eighth Class County Assessment Law[5] includes a more specific direction to the trial court to determine, *inter alia,* the market value of the subject property. *See* 72 P.S. § 5453.704(b). In essence, '[t]he Legislature has confided to the Court of Common Pleas the duties of fact finder where there has been an appeal from an assessment for taxes.' *Appeal of Edmonds,* . . . 172 A. 103, 104 ([Pa.] 1934); *accord Appeal of Park Drive Manor,* . . . 110 A.2d 392, 394 ([Pa.] 1955); *In re Lehigh & Wilkes-Barre Coal Co.,* . . . 151 A. 359, 359 ([Pa.] 1930).

This does not mean that the trial court becomes an assessor, or an appraiser[.] Rather, in assessment cases, as in others, the trial court must make its determination on the basis of the evidence put before it. The credibility and weight of such evidence is for the trial court to determine. Thus, as this Court has recently observed, '[t]he duty of the trial court in hearing a tax assessment appeal *de novo* is to independently determine the fair market value of the parcel on the basis of the competent, credible and relevant evidence presented by the parties.' *Westinghouse* [*Elec. Corp. v. Bd. of Prop. Assessment of Allegheny Cnty.,*] 652 A.2d [1306,] 1311 [(Pa. 1995)]

---

[5] Section[] . . . 704 of the Fourth to Eighth Class County Assessment Law, Act of May 21, 1943, P.L. 571, *as amended*, *formerly* 72 P.S. § . . . 5453.704, [was] repealed by Section 6(1)(ii) of the Act of October 27, 2010, P.L. 895, which [was] virtually identical to Section[]. . . 8854(a)(2) and (3) of the Consolidated County Assessment Law.

*In re Appeal of Springfield Sch. Dist. from the Decision of the Bd. of Assessment Appeals of Delaware Cnty.*, 101 A.3d 835, 844 (Pa. Cmwlth. 2014).

> (quoting *In re Appeal of Jostens, Inc., . . .* 508 A.2d 1319, 1323 ([Pa. Cmwlth.] 1986) (citations omitted)).

*Green v. Schuylkill Cnty. Bd. of Assessment Appeals*, 772 A.2d 419, 425-26 (Pa. 2001) (citations omitted).

> 'The trial court has the discretion to decide which of the methods of valuation is the most appropriate and applicable to the given property.' *Willow Valley Manor v. Lancaster C[nty.] B[d.] of Assessment Appeals,* 810 A.2d 720, 723 (Pa. Cmwlth. 2002). 'In tax assessment appeals, actual value or fair market value is determined by competent witnesses testifying as to the property's worth in the market; i.e., the price a willing buyer would pay a willing seller, considering the uses to which the property is adapted and might reasonably be adapted.' *Id.*
>
> In performing *de novo* review in tax assessment appeals, the trial court is the ultimate finder of fact. *In re Penn–Delco Sch. Dist.,* 903 A.2d 600 (Pa. Cmwlth. 2006). 'As fact-finder, the trial court maintains exclusive province over matters involving the credibility of witnesses and the weight afforded to the evidence.' *Id*. at 608. 'As a result, this Court is prohibited from making contrary credibility determinations or reweighing the evidence in order to reach an opposite result.' *Id.*

*Parkview Court Assocs. v. Delaware Cnty. Bd. of Assessment Appeals*, 959 A.2d 515, 520-21 (Pa. Cmwlth. 2008).

> Nevertheless, as fact-finder, 'the trial court must state the basis and reasons for its decision.' *Green . . .* , 772 A.2d [at] 433 . . . .  If the trial court rejects an expert's testimony for specified reasons, an appellate court may review the validity of those reasons.  Further, if an expert uses an improper factor when fixing the fair market value of real estate, his opinion is not substantial evidence that can support a finding of value.

*Aetna*, 111 A.3d at 279 (citation omitted).

8

In the instant matter, the trial court discussed the expert testimony, explaining:

> During the non-jury trial, the [Taxpayers] called [Lesavoy] who completed an appraisal for the [Property] on January 1, 2015. [Lesavoy] testified that based upon the sales comparison approach and an income approach to value, the implied market value for the [P]roperty is $6,191,666.00 for 2015. [Lesavoy] further testified that for purposes of reaching a valuation conclusion as to the comparable sales approach the market value of the [Property] is $120.00 a square foot or $3,100,000.00. Through the income approach, [Lesavoy] found a market value of $3,180,000.00.
>
> [Lesavoy] again opined with a reasonable degree of professional certainty for the [P]roperty for the tax year 2015 was $3,150,000.00 and that this value had declined from the values of 2014 and 2013. He testified that the implied value of the [Property] in 2012 was $5,701,350.00 and in 2014 it was $5,621,531.00. [Lesavoy] continued by opining that the final value as of September 2012 (tax year 2013) was $3,300,000.00 and in January 2014 was $3,370,000.00. Although [Lesavoy] testified that he considered the cost approach, he determined that it is not applicable.
>
> On cross-examination, [Lesavoy] testified that he defined market value utilizing the federal financing definition as opposed to the definition adopted by the Pennsylvania Supreme Court. He further testified that he utilized bank[] sales in his sales comparison approach. The properties that [Lesavoy] used to compare consisted of a diagnostic facility, a modern facility that was part medical and part office, a smaller space and buildings that required upgrades, whereas the [Property] is a modern facility in a rural area.
>
> The Board called [Bates] who testified that he has appraised numerous medical office properties, including the [Property] at issue in 2008. [Bates] employed all three methods of valuation including the cost, sales comparison and income approach to value. Utilizing a

9

cost approach, [Bates] opined that the value of the [Property] in 2012 as $5,550,000.00, $5,825,000.00 in 2014 and $5,850,000[.00] in 2015. [Bates] testified that as a result of increasing construction costs and increasing depreciation, there was a small increase in value between 2014 and 2015. Utilizing the sales comparison approach, [Bates] opined that the value of the [P]roperty as of January 1, 2015 was $6,450,000.00. [Bates] next used the income approach and opined that in 2012 the value of the [Property] was $5,820,000.00 and in 2014 it was $5,890,000.00.

In formulating his opinion, [Bates] considered the [Pennsylvania] Supreme Court mandated definition or market value, the uses to which the [P]roperty could be applied, the lease on the [P]roperty, market factors, the changing pattern of delivery of medical services, the market changes throughout the periods under analysis, [P]roperty factors, the [P]roperty location, the subject land and building, the quality, quantity and configuration of the [P]roperty, the terms and conditions of the lease, current replacement costs, improved property sales, market rents and surveyed capitalization rates.

[Bates] opined that the market value of the [Property] as of September 1, 2012 was $5,650,000.00, as of January 1, 2014 was $5,850,000.00 and as of January 1, 2014 was $6,220,000.00. Based upon the testimony of the experts, consideration of the methods and approaches utilized by each in opining regarding values of the [Property] and review of the entire record, this [trial c]ourt determined that [Bates] was more credible and as such, this [trial c]ourt utilized the values as set forth by [Bates].

R.R. at 1082a-1084a (citations omitted).

Taxpayers first argue that the trial court erred by crediting Bates' valuation opinion, which relied on out-of-market comparables and contained miscalculations. Specifically, Taxpayers contend that, in determining the Property's market value under the income approach, Bates should have used a hypothetical market rental rate of comparable rentals, rather than the Geisinger

10

lease rate which was based on a design-build project and, thus, was inflated by site acquisition and building construction costs. Further, Taxpayers assert that Bates improperly justified his use of the Geisinger lease rate by referencing rental rates of comparable buildings in "superior markets." Taxpayers' Br. at 45.[6]

This Court recently rejected a similar argument. In *Downingtown Area School District v. Chester County Board of Assessment Appeals*, 131 A.3d 152 (Pa. Cmwlth. 2015), property owner, LTK Associates, L.P. (LTK) and Walgreen Eastern Company, Inc. (Walgreens) appealed from a trial court order establishing the assessed value of property leased to a Walgreens' pharmacy. LTK constructed the building on the property to Walgreens' specifications. Walgreens entered into a 25-year lease with multiple extension options. The lease price to Walgreens was 58.5% above market value, and Walgreens was responsible for paying the property's real estate taxes. This Court noted that the trial court had acknowledged:

> [A] long-term lease must be considered in establishing a property's market value because it is a factor that affects the price a purchaser is willing to pay for a property. . . . [W]hen a property generates income, the income approach is an appropriate method to use in ascertaining its value. When applying that method, the contract rent received under the lease is the relevant income stream that is to be capitalized, even if it is below prevailing market rental sales.

_____

[6] Taxpayers' assertion that Bates' valuation ignored the fact that the subject Property was a design-build project and, thus, the trial court erred when it relied on Bates' testimony is without merit. An expert's failure to properly consider a factor affecting the value of a property "goes only to the weight of the expert's testimony, not its competency." *In re Appeal of Prop. of Cynwyd Invs.*, 679 A.2d 304, 310 (Pa. Cmwlth. 1996). Thus, even if we were to conclude that Bates erred by using the Geisinger lease rate in his income approach analysis (which we do not), such error would not affect the competency of his testimony, only the weight. Because the trial court acted well within its authority in finding Bates credible and affording his testimony weight, this Court may not reweigh that evidence. *See Parkview.*

11

The trial court also cited *Tech One Associates v. Board of Property Assessment, Appeals and Review of Allegheny County, . . .* 53 A.3d 685, 703 ([Pa.] 2012), wherein the Pennsylvania Supreme Court stated that the market value of the property as a whole, including the leased fee and leasehold interest, must be considered.

*Downingtown*, 131 A.3d at 155 (citations omitted).  LTK and Walgreens argued that

the leasehold interest must be determined by comparing the tenant's position under the lease to market rent. [LTK and Walgreens] contend that because Walgreens' contract rent is above-market, the leasehold is negative. Specifically, according to *The Appraisal of Real Estate* 441 (14th ed. 2013), '[t]he value of a leasehold estate may be positive, zero, or negative, depending on the relationship between market rent and contract rent. . . . The difference between the market rent and contract rent may be capitalized at an appropriate rate or discounted to present value to produce an indication of the leasehold value, if any. . . .'  Here, Walgreens pays $31.71 [per square foot], which is above the market rent of $20[.00 per square foot].  Walgreens is in an inferior position for what it pays to occupy the retail space.  Walgreens maintains that the economic reality of the lease is that over the remaining 22 years, it will pay $3,362,485[.00] more than other tenants in the market for similar space.

*Downingtown*, 131 A.3d at 156-57.  This Court rejected LTK's and Walgreens' argument and affirmed the trial court, stating:

We conclude that the trial court correctly disregarded [the t]axpayers' negative leasehold interest calculation. In *Tech One,* Tech One owned the land and received contract rent from Terra Century Associates, which owned the buildings and improvements.  *Id.* at 686–87. Terra Century also received rent from entities that leased the buildings.  To determine the fair market value of the property, the Pennsylvania Supreme Court held that it was necessary to value both the leased fee held by Tech One and the leasehold held by Terra Century.

> Here, LTK owns all of the [p]roperty, including the land, the buildings, and the surrounding improvements. Nonetheless, *Tech One* requires valuation of both the leased fee and the leasehold. As to the leased fee, Walgreens does not sublease the space and, therefore, receives no rent as in *Tech One.* Moreover, the economic reality of Walgreens' lease is that a willing buyer would pay $0 for the lease because no one would be interested in paying above-market rent. Although Walgreens is paying above-market rent, there is no negative effect on the value of the [p]roperty. Accordingly, the trial court did not err.

*Downingtown*, 131 A.3d at 157 (citations omitted).[7]

---

[7] Importantly, Taxpayers acknowledge *Downingtown*, but fail to effectively distinguish it, stating:

> [Taxpayers are] aware of the Commonwealth Court's opinion in [*Downingtown*] where the Court held that the taxpayer's negative leasehold interest calculation should be disregarded. And instead, according to the economic realities, the value of the leasehold interest must be considered even if that leasehold interest is paying rent at, 'above[-]market rate rent.' **The single distinguishing [sic] between [*Downingtown*] and this case is that in *Downingtown* the contract rent was simply that, contract rent.** Whereas in this case, contract rent constitutes reimbursement for the cost of construction, thereby justifying [Taxpayers' expert's] position that contract rent should be ignored and a market rate of rent developed in order to determine the true market value of the Property.

Taxpayers' Br. at 26 n.16 (emphasis added). Contrary to Taxpayers' assertion, there is nothing in this Court's *Downingtown* opinion indicating that the rent payments differed in any significant way from those in the instant matter, or that "the [above-market] contract rent was simply that, contract rent." Taxpayers' Br. at 26 n.16. Instead, as in the case at bar, the property owner "developed the [p]roperty according to [the tenant's] specifications[, and s]ince its construction . . . , the building has been occupied by [the tenant] pursuant to a long-term lease . . . ." *Downingtown,* 131 A.3d at 154. Further, as in the instant action, the tenant in *Downingtown* was paying above-market rental rates. Thus, we do not agree that Taxpayers' "single distinguishing" factor is indeed distinguishable. Taxpayers' Br. at 26, n.16.

13

Thus, we herein conclude that Bates properly used Geisinger's lease rate in determining the Property's fair market value using the income approach.[8] Accordingly, the trial court did not err when it relied thereon.[9]

Taxpayers next argue that the trial court erred by crediting Bates' valuation opinion based upon a cost multiplier for the cost approach that was not specific to the type of facility located on the Property. Bates testified that he relied on Marshall & Swift to determine the replacement costs of a medical clinic similar to the Property. *See* R.R. at 284a. Bates used the cost criteria for a medical building. Although Marshall & Swift provides cost multipliers for various types of buildings, Bates admitted that it does not have a cost multiplier for a medical **clinic** as distinguished from a medical building.[10] Accordingly, Taxpayers contend that "almost no reliance can be placed upon [Bates'] reliance on the cost approach because his primary source for estimating costs does not have a specific cost

---

[8] Taxpayers also contend that Bates' "income approach to value . . . contained at least two (2) mathematical errors, thereby undermining the **credibility** of this methodology of valuation." Taxpayers' Br. at 48 (emphasis added). Bates explained that his opinion of market value using the income approach was based on a range of comparable values, rather than an average of those values. Thus, an error in his calculations of one of the lease rates did not render his opinion invalid. Although Taxpayers may be correct in their assertion, **credibility** determinations are within the exclusive province of the trial court. *See Parkview*.

[9] We further reject Taxpayers' argument that Bates' opinion on market-rate rent was improperly supported by rental rates in superior markets. We address that assertion in our discussion of Taxpayers' third argument pertaining to Bates' use of comparables from dissimilar marketplaces for his valuation using the sales comparison approach.

[10] On cross-examination, the following exchange occurred:

Q. [Taxpayers' Counsel:] And that all started off with a number from Marshall [&] Swift, which doesn't start with the same kind of building that is the subject, correct? You don't know that. There's not that classification within Marshall [&] Swift.

A. [Bates:] Correct.

R.R. at 422a.

14

multiplier for the very type of building that is the subject of this appeal." Taxpayers' Br. at 49. Quoting *Grand Prix Harrisburg, LLC v. Dauphin County Board of Assessment Appeals*, 51 A.3d 275, 280 (Pa. Cmwlth. 2012), Taxpayers argue that "if an appraiser uses an improper factor when fixing the fair market value of real estate, his opinion is not substantial evidence that can support a finding of value." Taxpayers' Br. at 49-50.

Notably, Bates did not agree that a distinction between a medical building and medical clinic rendered his opinion invalid or inaccurate. Further, Lesavoy did not believe the cost approach was a useful way to determine the Property's value, and Taxpayers do not indicate what alternate source Bates should have used.

In *Grand Prix*, this Court vacated a trial court's order setting a property's fair market value where an expert admitted his sales comparison approach (one of two approaches accepted by the trial court) was flawed, and the trial court failed to resolve differences in capitalization rates for the other approach. This Court concluded:

> Although it is the trial court's prerogative to deem one expert more credible than the other, the trial court must explain its decision. Here, the trial court failed to consider, and resolve, the differences in the two capitalization rates and the fact that [the taxing authority's appraiser's] sales comparison approach was flawed, by his own admission.

*Grand Prix*, 51 A.3d at 282.

In *Buhl Foundation v. Board of Property Assessment, Appeals and Review of Allegheny County*, 180 A.2d 900 (Pa. 1962), the taxing authority's appraiser testified that "he considered several factors in arriving at his conclusion as to the value of the buildings involved, but an analysis of his testimony ma[d]e it

clear that **the major and basic factor used was depreciated reproduction costs.**"

*Id*. at 902 (emphasis added). Our Supreme Court explained:

> The actual or fair market value, while not easily ascertained, is fixed by the opinions of competent witnesses as to what the property is worth on the market at a fair sale. Many factors should be taken into account by the expert witness in arriving at his estimate of value. However, . . . reproduction cost is not one of them. In fact, reproduction cost has no probative value for any purpose in fixing the fair market value of improved real estate for tax purposes.
>
> Since an improper factor was admittedly used in computing the assessment, the presumed validity thereof was overcome. Further, since the only evidence offered in support of the assessment as made was this estimate based upon improper considerations, the finding of value of the court below, sustaining the assessment, cannot stand. The finding of value by the trial court must be supported by competent evidence.

*Id.* at 902 (citations omitted).[11]

In the instant action, Bates used all three valuation approaches with similar results, and neither Bates nor the trial court relied primarily on the cost approach in reaching the ultimate valuation determination. Thus, even if we were to conclude that Bates' cost approach was flawed, the trial court's decision would not be invalidated. Accordingly, Taxpayers' argument fails.

---

[11] In *Buhl Foundation*, the Court held that the appraiser's opinion of fair market value could not stand because he used the reproduction cost, an improper factor. *Buhl Foundation*'s holding that reproduction cost is an improper factor was subsequently superseded by statute as explained in *Appeal of Kriebel*, . . . 470 A.2d 649, 651 n.3 ([Pa. Cmwlth.] 1984).

*Grand Prix*, 51 A.3d at 280 n.3.

16

Finally, Taxpayers contend that the trial court erred by crediting Bates' opinion in which his sales comparison approach relied on comparables in superior marketplaces, and he failed to make appropriate adjustments to reflect the higher values in those markets. Specifically, Taxpayers argue that Bates' comparables were not representative of the marketplace in Wyoming County. Specifically, they point to the following admissions made by Bates:

- Wyoming County is 25 miles from Luzerne County and 25 miles from Lackawanna County;

- Wyoming County has approximately 28,000 residents;

- Luzerne County and Lackawanna County are 9 times larger in population;

- The unemployment rate in Wyoming County is greater than the unemployment rate statewide;

- Wyoming County is not accessible by Interstate;

- Route 81 is a major artery which is at least 25 miles away from Wyoming County;

- The Property is a design-build project;

- The traffic count at the Property is approximately 17,000 cars per day.

Taxpayers' Br. at 47. Taxpayers maintain that the comparables Bates used were not located in marketplaces similar to that in which the Property is located, or in areas with similar population, traffic counts and similar distance from major highways, and further, that there were significant differences in the floor plans of the comparables Bates considered. They assert that Bates should have made material adjustments based on these differences.

This Court addressed a similar argument in *Aetna*. There, the trial court found, and the parties did not dispute, that the comparable sales approach

17

was the most appropriate method for valuation. The subject property was owner-occupied. The taxing authority's expert based his valuation of the property on comparable properties that had been sold subject to a tenancy (Tenant Comparables). The taxpayer in *Aetna* argued that "the Tenant Comparables [were] significantly dissimilar to the [subject p]roperty because they involve[d] tenant(s) in residence at the time of sale, whereas the [subject p]roperty [was] only owner-occupied and would be vacant or tenant-less upon its sale" and that the expert's "reliance served to inflate the [p]roperty's market value." *Id*. at 278. Thus, according to the taxpayer, the trial court should not have accepted the expert's testimony as competent.

In rejecting the taxpayer's argument, this Court stated:

The courts of this Commonwealth have held that **shared features between properties can render them substantially similar and able to be compared as a matter of law and that, generally, any dissimilarities [sic] is a matter that goes to the weight of the evidence rather than its admissibility or competency.** *See McKnight Shopping C*[*tr., Inc. v. Bd. of Prop. Assessment of Allegheny Cnty.,*] 209 A.2d [389,] 393 [(Pa. 1965)] (stating that properties need not be identical to be comparable and comparisons may be based, among other things, on sales according to similarities in use, size, and type of construction); *Pennypack Woods Home Ownership Assoc*[*'n*] *v. B*[*d.*] *of Revision of Taxes, . . .* 639 A.2d 1302, 1306 ([Pa. Cmwlth.] 1994) (concluding that taxpayer's contention 'that [the board's expert] did not take into account the differences between the newer units that he used as comparables and the older [taxpayer's] units' raised an issue of credibility). For instance, this Court in *Appeal of Avco Corporation, Lycoming County, . . .* 515 A.2d 335, 338 ([Pa. Cmwlth.] 1986), concluded: 'Properties may be similar for comparison purposes without being identical, and **the difference** [sic] **goes to the weight,** *i.e.,* **the persuasive quality, of the expert's testimony. Of course, the**

18

**weight accorded to an expert's testimony is for the fact finder to determine.**'

*Aetna*, 111 A.3d at 279-80 (emphasis added). The Court further stated:

Turning to [the taxpayer's] argument that [the taxing authority's expert] Abissi was required to make an adjustment to the [p]roperty's market value because he used Tenant Comparables, our decision in *In re Appeal of Property of Cynwyd Investments,* 679 A.2d 304 (Pa. Cmwlth. 1996), is informative. In that case, the taxpayer argued that the testimony of the expert for the board of assessment was incompetent because the expert did not make an adjustment for leases encumbering the property. This Court disagreed, noting that the 'expert testified that he did consider the existing leases but made no separate calculation in determining . . . the market rental value of the property.' *Id.* at 309.

We concluded in *Cynwyd Investments* that even if the leases would have had a significant impact on the property's market value, once the expert testified that he took the leases 'into consideration but did not make an adjustment, this failure to make an adjustment, if anything, goes to the weight of his testimony and not its competency.' *Id. See also id.* at 310 (reiterating that **an allegation that an expert failed to properly consider a factor affecting the value of the property 'goes only to the weight of the expert's testimony**'). Because **the trial court has exclusive control over the weight to be assigned to the evidence**, this Court in *Cynwyd Investments* concluded that the trial court did not err in finding the testimony of the board's expert credible. *Id.* at 310.

In *Parkside Townhomes Associat[es] v. Board of Assessment Appeals of York County,* 711 A.2d 607 (Pa. Cmwlth. 1998), this Court followed *Cynwyd Investments* and concluded that where the expert considered the effect that tax credits have on the property's sale price and determined that the tax credits were not relevant, **the expert's 'failure to make an adjustment of his appraisal goes to weight of the [] testimony not its competency.**' *Id.* at 611-12.

In this case, Abissi testified that the owner-occupied nature of the building was a factor for valuation; explained that he used the Tenant Comparables because there were not many sales of owner-occupied buildings to compare; and affirmed that he considered making adjustments to the [p]roperty to account for this dissimilarity by utilizing an adjustment formula. It is unclear, though, whether Abissi actually made adjustments after running them through his adjustment formula. . . .

Nonetheless, as in *Cynwyd Investments* and *Parkside Townhomes Associates,* Abissi **expressly considered** the difference in occupancy between the [p]roperty and the Tenant Comparables at the time of sale. **Because Abissi considered** the owner-occupied nature of the [p]roperty as a factor, his reliance on the Tenant Comparables does not render his testimony incompetent, and, to the extent that [the taxpayer] contests the amount of Abissi's adjustments or his failure to make adjustments, these contentions **challenge the weight of the evidence**.

**It is well-established that determination of evidentiary weight is a matter reserved exclusively to the trial court and that this Court cannot reverse such determinations**. *See RAS Dev*[.] *Corp.* [*v. Fayette Cnty. Bd. of Assessment Appeals*]*,* 704 A.2d [1130,] 1137 [(Pa. Cmwlth. 1997)] ('[**I**]**t is well-settled that all matters of credibility and evidentiary weight are within the exclusive province of the trial court and that these determinations are binding on this Court.**').

*Aetna*, 111 A.3d at 280-82 (citations and footnote omitted; emphasis added).

In the instant matter, Bates testified extensively regarding the process he used in assessing the building's value. He explained that "one of the things that [he] looked at in finding sales that [he] wanted to consider to compare with the subject [P]roperty was comparability. Not so much comparability of location . . . but comparability of function." R.R. at 286a. He acknowledged the differences in

20

the geographic areas between the comparables and the Property and explained his rationale in using them:

> The nature of these modern medical clinics is to serve a neighborhood, not an entire region. A major hospital, like Geisinger Wilkes-Barre, Geisinger Danville, they are regional. To them, the highway - major highway access becomes significant, but for a neighborhood service facility, like the subject, like most of these, it's serving a relatively small area because a few miles away is something competitive in most cases. Now, in terms of traffic count, people don't drive down the road and suddenly pull into a medical office the way they would at McDonald[']s or a gas station, so traffic count can be beneficial in terms of visibility, but it has a – the other side of that sword is that it can make it difficult to get into the [P]roperty.

R.R. at 379a-380a. He later expounded:

> In the current market for real estate to serve the medical needs of a community, the concept definitely is a hub and spoke. The hub being the general or critical care hospital, the spokes – the end of the spokes are these neighborhood clinics that serve small areas of the greater community. Geisinger was one of the first proponents of this scheme, having regional medical offices, now regional clinics, but other hospitals are adopting a similar model so it's not so much important as to what the county population is. What you do is you look at the nature of the neighborhood. The other factor about the larger population areas is there is a huge supply of medical practitioners and of the buildings that serve them so for example, I mentioned that Exton, which is a relatively small area with good population, I will admit, has a hundred - I counted 181 medical service providers. OK, we have about nine or ten here in Wyoming County. Now, what does that mean? It means that the medical expenditures by patients are split up into many more segments. It also means there are many more medical buildings out there so if someone is unhappy with the building that he's in, he can leapfrog to another building much more easily than that would be possible here in

21

> Wyoming County. It would necessitate new construction here whereas there's an inventory of medical office properties that are adaptable and represent alternatives.

R.R. at 426a-427a. He stated, however, that he gave the various locations differing characteristics consideration, *see, e.g.,* R.R. at 371a, and made adjustments based upon the differences in the types of properties he used as comparables. *See, e.g.,* R.R. at 243a-245a, 366a, 915a-921a. Given that Bates considered these differences in the nature of the comparable properties, the differences themselves do not "render his testimony incompetent, and, to the extent that [Taxpayers] contest[] the amount of [Bates'] adjustments or his failure to make adjustments, these contentions challenge the **weight** of the evidence." *Aetna*, 111 A.3d at 281 (emphasis added).

> In contrast, the trial court noted that Lesavoy
>
> defined market value utilizing the federal financing definition as opposed to the definition adopted by the Pennsylvania Supreme Court. He further testified that he utilized bank[] sales in his sales comparison approach. The properties that [Lesavoy] used to compare consisted of a diagnostic facility, a modern facility that was part medical and part office, a smaller space and buildings that required upgrades, whereas the [Property] is a modern facility in a rural area.

R.R. at 1083a (citations omitted). The trial court found Bates more credible "[b]ased upon the testimony of the experts, consideration of the methods and approaches utilized by each in opining regarding values of the [Property] and a review of the entire record[.]" R.R. at 1084a. There is sufficient record evidence to support the trial court's decisions. "Because the trial court has exclusive control over the weight to be assigned to the evidence," Taxpayers' argument fails. *Aetna*, 111 A.3d at 280.

22

For all of the above reasons, the trial court's orders are affirmed.


_____
ANNE E. COVEY, Judge

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Martin P. Mariano and Beverly A. Mariano, | : | |
| Appellants | : | |
| | : | |
| v. | : | |
| | : | |
| Wyoming County Board of Assessment Appeals & Revision of Taxes, Wyoming County, Tunkhannock Area School District and Tunkhannock Borough | : | No. 2489 C.D. 2015 |

### O R D E R

AND NOW, this 5th day of July, 2016, the Court of Common Pleas of the 44th Judicial District (Wyoming County Branch's) October 9, 2015 order and October 29, 2015 amended order are affirmed.


_____
ANNE E. COVEY, Judge